AMERITECH SERVICES, INC., Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Brian Dolk, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—08—1412WC

Opinion filed March 17, 2009.

Hennessy & Roach, of Chicago (James P. Roach, of counsel), for appellant.

Lewis, Davidson & Hetherington, of Chicago (Alan Karpel, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

Ameritech Services, Inc. (Ameritech), appeals from an order of the circuit court of Cook County which confirmed a decision of the Illinois

Workers' Compensation Commission (Commission) awarding the claimant, Brian Dolk, benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)). For the reasons that follow, we affirm the judgment of the circuit court.

The following factual recitation is taken from the evidence presented at the arbitration hearing.

The claimant was employed by Ameritech as a "Universal Account Executive" on June 12, 2000. According to Ameritech's letter of May 25, 2000, offering the claimant a job as a Universal Account Executive, his annual base salary was $34,000 plus commissions. He was also to receive a one-time draw of $2,167 for his first month of employment and a one-time draw of $1,083 for his second month of employment. These draws were not recoverable against any commissions to which the claimant might be entitled.

The claimant's duties as a Universal Account Executive included selling telephone equipment and services to business customers northwest of Chicago in the O'Hare region. At all relevant times, the claimant was working from home and communicating with Ameritech by computer, telephone, and fax machine pursuant to Ameritech's "Telework" policy. The claimant used his personal automobile while working. He made up to five sales calls to customers each day. When visiting a customer, the claimant would bring demonstration equipment weighing about 50 pounds along with a laptop computer, printer, peripherals, and supplies which together weighed about 25 pounds. Although not required to do so, the claimant visited Ameritech's offices in Chicago on a weekly basis to pick up supplies.

On August 7, 2000, the claimant intended to drive to Ameritech's Chicago office for a conference call and to pick up sales literature. In preparation for the journey, the claimant carried his demonstration equipment, computer, and printer on his right shoulder as he walked down the stairs from his apartment to his car. The claimant testified that the equipment he was carrying weighed 75 to 80 pounds. According to the claimant, he experienced a sharp pain in his lower back as he walked down the stairs. He dropped the equipment that he was carrying and went back to his apartment to lie down, hoping the pain would pass.

When the pain in his back failed to subside, the claimant went to the emergency room at Northwestern Memorial Hospital (Northwestern). The claimant testified that X-rays of his back were taken while he was in the emergency room. Northwestern's record of that visit states that the attending physician diagnosed a back strain and prescribed Vicodin. According to the claimant, the doctor in the emergency room took him off of work and referred him to Dr. Giri T. Gireesan, an orthopaedic surgeon.

The claimant first saw Dr. Gireesan on August 9, 2000. The doctor's notes of that visit state that the claimant complained of pain in his neck and back and that he reported having experienced a sharp pain in his back as he "went to pack up his demo kit and the laptop bag weighing around 75 pounds." When deposed, Dr. Gireesan testified that his physical examination of the claimant revealed that he had 50% reduction in his lumbosacral flexion. Dr. Gireesan recommended that the claimant have an MRI scan of his lumbosacral spinal area. The doctor's notes reflect that he gave the claimant a prescription for Norco and authorized him to remain off of work.

The claimant underwent the recommended MRI scan on August 10, 2000. The radiologist's report states that the scan revealed diffuse degeneration at L4-L5 and a small central disc herniation at that level along with a slightly eccentric right-sided disc herniation at L5-S1 which was "probably chronic."

The claimant returned to see Dr. Gireesan on September 19, 2000, again complaining of severe pain. Dr. Gireesan's notes of that visit state that he examined the claimant and reviewed his MRI scan. As of that date, Dr. Gireesan diagnosed the claimant as suffering from lower back pain arising from bulging discs at L4-L5 and L5-S1, "aggravated as result of a work related injury." The doctor again authorized the claimant to remain off of work and told him to return in two weeks for a follow-up visit.

When the claimant next saw Dr. Gireesan on October 11, 2000, he reported some improvement after physical therapy. However, he was still bothered by back pain and continued to take Norco on a daily basis. Dr. Gireesan's notes of that visit reflect that his diagnosis remained unchanged and that he prescribed anti-inflammatory medication. At his deposition, Dr. Gireesan testified that he advised the claimant to contact Ameritech and request light-duty work.

At Ameritech's request, the claimant was examined by Dr. Prem Pahwa, an orthopaedic surgeon, on October 25, 2000. In his report of that visit, Dr. Pahwa noted that the claimant gave a history of having been injured on August 7, 2000, which was consistent with the history that he gave to Dr. Gireesan. The report states that the claimant complained of constant low-back pain and intermittent spasms and weakness of the right leg. Following his examination of the claimant, Dr. Pahwa diagnosed lumbosacral strain with "significant limitation of back motion due to pain." In his report, Dr. Pahwa recommended that the claimant receive three to four weeks of physical therapy and found that the claimant could return to light-duty work that does not require any lifting or repeated bending.

The claimant next saw Dr. Gireesan on October 11, 2000. At that

time, the claimant continued to complain of pain. The doctor's note states that the claimant was attending physical therapy and taking medication for pain. Dr. Gireesan authorized the claimant to work on a light-duty basis with no lifting of more than 10 to 15 pounds, no frequent bending or twisting, and no long distance driving.

When the claimant saw Dr. Gireesan on November 6, 2000, he reported that the pain medication he had been taking and the physical therapy he received had not relieved his pain. Dr. Gireesan again authorized the claimant to return to light-duty work with the restrictions he had previously imposed.

The claimant testified that he met with his supervisor, Juliette Fry, at Ameritech's Chicago office on November 6, 2000. According to the claimant, Fry wanted him to return to work in the same territory selling a service known as Complete Link. He stated that the position would require him to carry 50 pounds of demonstration equipment along with a laptop computer and printer. According to the claimant, Fry told him he would be required to report to work at Ameritech's Chicago office before going to his territory to see customers. The claimant testified that he informed Fry he could not accept the position that she offered because it did not comply with the restrictions which Dr. Gireesan had imposed.

Fry testified that the claimant was offered a position as a "Retention Account Executive." She stated that the position consisted of selling discounted services. According to Fry, the job was to be performed at Ameritech's Chicago office and could be done by phone or e-mail. She testified that the position did not require any driving to see customers. Fry stated that the claimant did not accept the position and left the office.

The claimant returned to see Dr. Gireesan on December 6, 2000. The claimant reported that he was attending physical therapy but his condition had not improved and he was still experiencing pain. Dr. Gireesan's note of that visit states that the claimant told him that Ameritech had not made any accommodations to facilitate his return to work. The note also reflects that the doctor's diagnosis remained unchanged, that he continued to recommend a course of conservative treatment, and that he concluded that the claimant could not perform his previous job. Dr. Gireesan again authorized the claimant to engage in light-duty work with no lifting of more than 10 to 15 pounds and no frequent bending or twisting.

The claimant was examined on December 11, 2000, by Dr. Venu Akuthota at the Rehabilitation Institute of Chicago (RIC). In his report of that examination the doctor recorded an impression of a lumbar annular tear at L4-L5 and L5-S1. Dr. Akuthota recommended that the

claimant participate in an active exercise program. He noted a belief that the claimant was "probably" a good candidate for an epidural injection.

The claimant testified that he was involved in an automobile accident on December 24, 2000, which exacerbated his low-back pain for several weeks. He went to see Dr. Gireesan on January 2, 2001. The doctor testified that he recommended that the claimant not work due to the increased pain in his back which was caused by the auto accident, and he ordered a new MRI of the claimant's lumbar spine.

The claimant next saw Dr. Gireesan on January 10, 2001. Dr. Gireesan testified that he reviewed the MRI which was taken after the claimant's last visit. According to the doctor, the scan revealed no new changes in the claimant's spine. The doctor's notes of that visit state that the claimant's low-back pain had returned to its "baseline" and that he could perform light-duty work. Dr. Gireesan testified that he imposed the same work restrictions that he had recommended prior to the claimant's auto accident.

The claimant testified that he contacted Fry and requested light-duty work which complied with his restrictions. As an alternative, the claimant requested a transfer to a different department which could accommodate his restrictions. He also requested that he be allowed to telecommunicate. Subsequently, the claimant was contacted by Kelly Mace, Ameritech's human resource manager, and told to report to work on January 29, 2001, to begin a three-week training course for the Retention Account Executive position.

The claimant saw Dr. Gireesan on February 7, 2001. The doctor testified that the claimant continued to complain of back pain. Dr. Gireesan also stated that the claimant reported taking pain medication, using a TENS unit, and attending physical therapy.

On February 15, 2001, the claimant attended Ameritech's annual sales meeting at the Rosemont convention center. According to the claimant, he was experiencing significant pain when he arrived at the meeting after having driven 45 minutes. During the meeting, the pain increased in intensity, requiring the claimant to leave the auditorium and lie down. The claimant testified that he saw Fry at the meeting and told her of the pain he was experiencing and attempted to discuss his job responsibilities and his medical restrictions. The claimant stated that Fry did not have time to discuss the matters at that time. Following the lunch break, the claimant returned to the meeting. According to his testimony, however, he was in so much pain that he could not concentrate and, as a consequence, he went home, took pain medication, went to bed, and did not wake up until the following day in the afternoon.

The claimant did not return to the sales meeting on February 16, 2001. When he awoke on February 16, 2001, the claimant received a voice-mail message from Fry expressing disappointment that he had not attended the sales meeting. The claimant testified that he sent an e-mail to Fry explaining that the pain in his back prevented his attendance.

The claimant worked at Ameritech's Chicago office on February 19, 2001. He took time off of work from February 20, 2001, through February 25, 2001. The claimant returned to work at Ameritech's Chicago office on February 26, 2001. He testified that he had a scheduled meeting with Fry on that date, but she failed to show up.

On February 28, 2001, the claimant went to see Dr. Gireesan. Following his doctor's appointment, the claimant returned to Ameritech's Chicago office and met with Fry. He testified that Mace also participated in the meeting via conference call. According to the claimant, Fry and Mace did not offer him any position that complied with the work restrictions imposed by Dr. Gireesan. He testified that Mace took the position that his physical condition was the result of his motor vehicle accident and was no longer a workers' compensation issue. The claimant stated that he did not return to work because he was not offered a position within his restrictions.

At Ameritech's request, the claimant was again examined by Dr. Pahwa on March 7, 2001. In his report of that examination, Dr. Pahwa wrote that the claimant complained of constant low-back pain and some weakness in his right leg. According to Dr. Pahwa, the claimant's low-back pain persists and he has limited back motion. However, his neurovascular examination of the claimant was essentially normal and did not show evidence of any disc herniation or radiculitis. Dr. Pahwa opined that the claimant's motor vehicle accident temporarily aggravated his back condition, but concluded that his main problem goes back to the incident on August 7, 2000. Dr. Pahwa recommended that the claimant continue physical therapy, and he was of the opinion that the claimant could do light-duty work subject to the following restrictions: no lifting over 15 pounds, no repeated bending, and his driving should be limited to driving to and from work.

The claimant continued under the conservative care of Dr. Gireesan. The doctor's notes from a May 1, 2001, visit reflect that, in addition to the restrictions which he had previously imposed, Dr. Gireesan restricted the claimant from driving more than 15 minutes at a time. In his notes of the claimant's visit on July 2, 2001, Dr. Gireesan wrote that the claimant continued to complain of severe lower back pain. Dr. Gireesan found that the claimant was unable to work and recommended that he attend the pain management program at RIC.

The claimant was again examined by Dr. Akuthota at RIC on July 10, 2001. In his report of that visit, Dr. Akuthota recorded an impression that the claimant suffered from chronic low-back pain syndrome and degenerative disc disease at L4-L5 and L5-S1. He recommended that the claimant undergo a multidisciplinary program for chronic pain, use a TENS unit, and take pain medication. The claimant testified that it was Dr. Akuthota's suggestion that he attend the chronic pain program at RIC, but Ameritech would not approve of the treatment. Dr. Akuthota also recommended that the claimant receive injection therapy.

The claimant was again examined by Dr. Pahwa, Ameritech's medical expert, on August 1, 2001. In his report of that examination, the doctor noted that the claimant complained of constant low-back pain, radiating at times to his right buttock; soreness in his neck; and weakness in his right leg. However, Dr. Pahwa wrote that his physical examination of the claimant revealed no objective findings to account for his ongoing back pain. Dr. Pahwa was of the belief that the claimant had reached maximum medical improvement (MMI), that he had exhausted the value of conservative treatment, and that he was not a candidate for surgery. Dr. Pahwa opined that the claimant could return to work with a restriction against lifting more than 15 pounds.

When the claimant saw Dr. Gireesan on September 5, 2001, he reported that his condition had not improved although he had been receiving spinal rehabilitation therapy at RIC. The claimant also reported that he had been seeing a psychiatrist and a psychologist to assist him in dealing with his pain. Dr. Gireesan recommended that the claimant receive lumbar epidural steroid injections. The doctor's notes of the visit state that the claimant was unable to work.

On referral from Dr. Gireesan, the claimant was seen by Dr. Honorio Benzon, an anesthesiologist, at Northwestern on October 5, 2001, who administered an epidural steroid injection. Thereafter, the claimant received a series of spinal injections from Dr. Benzon through June of 2002.

The claimant saw Dr. Gireesan on December 5, 2001, and reported that the epidural steroid injections which he received helped him somewhat, but that he experienced some muscle spasms. Dr. Gireesan recommended that the claimant attend the pain management program at RIC after Dr. Benzon completed his treatments. Dr. Gireesan again found that the claimant was unable to work.

On January 15, 2002, the claimant came under the care of Dr. Michael Haak, an orthopaedic surgeon, at Northwestern. In his report of that visit, Dr. Haak opined that the claimant suffered from "primarily strain type injuries" and degenerative disc disease. He

recommended that the claimant continue to take pain medication and referred the claimant for therapy and facet injections.

The claimant returned to see Dr. Haak on March 13, 2002. The doctor increased the dosage of the claimant's pain medication, gave him a prescription for a TENS unit, and advised him to continue physical therapy.

As of the claimant's visit on April 18, 2002, Dr. Haak was of the opinion that the claimant's "main problem" was his underlying degenerative disc. After reviewing the alternative treatments, Dr. Haak and the claimant agreed to a conservative course of treatment with medication.

On May 8, 2002, the claimant again saw Dr. Gireesan. The doctor's notes of that visit reflect that the claimant still complained of back pain, and he was attending a pain management program at Northwestern. Dr. Gireesan also noted that the claimant continued to take pain medication and was seeing a psychiatrist. Dr. Gireesan found that the claimant was still unable to work.

When the claimant saw Dr. Gireesan on October 7, 2002, he continued to complain of back pain. The claimant reported that he had rejected Dr. Haak's recommendation that he undergo a lumbar spinal fusion, electing instead to continue a course of conservative treatment. Dr. Gireesan prescribed pain medication and recommended a conditioning program. Dr. Gireesan's notes of the visit reflect that he informed the claimant that he had a labrum tear in his right shoulder and that he referred the claimant to Dr. Jason Ko for an arthroscopy and possible surgery.

In his notes of the claimant's visit on January 20, 2003, Dr. Gireesan recorded that the claimant had undergone shoulder surgery. He wrote that the claimant continued to have back pain and that he recommended that the claimant have a spinal fusion. The claimant rejected a surgical option. Dr. Gireesan's notes state that he prescribed pain medication and ordered a new MRI of the claimant's lumbosacral spine.

The claimant next saw Dr. Gireesan on March 3, 2003. Dr. Gireesan reviewed the claimant's current MRI and concluded that the claimant required a two-level discectomy and interbody fusion at the L4 and L5 levels to relieve his pain. However, the claimant continued to reject a surgical option. Dr. Gireesan was still of the belief that the claimant was unable to work.

Dr. Gireesan continued a course of conservative treatment of the claimant's condition with prescriptions for pain medication.

On March 5, 2003, the claimant was examined at Northwestern by Dr. Joshua Rittenberg, an orthopaedic surgeon. In his report of that

examination, Dr. Rittenberg recorded an impression that the claimant suffered from chronic low-back pain, degenerative disc disease, and "possibly" some facet mediated pain. Understanding that the claimant had rejected surgical options, Dr. Rittenberg referred the claimant for evaluation to determine whether he should undergo additional epidural injections and recommended that he enroll in a multidisciplinary pain program such as the chronic pain care center at RIC.

On March 17, 2004, the claimant was examined and evaluated by Dr. David Schneider, an orthopaedic surgeon. In his report of that visit, Dr. Schneider wrote that the claimant has diffuse disc bulges at L4-L5 and L5-S1 with protrusions at both levels. He opined that the claimant would need a spinal fusion.

In March 2004, the claimant had another MRI which, according to Dr. Gireesan's note of July 14, 2004, revealed bulging discs at L4-L5 and L5-S1 with evidence of an annular tear. The doctor again recommended a spinal fusion.

The claimant participated in a pain management program at RIC. However, he reported to Dr. Gireesan that, due to extreme back pain, he was only able to attend the program for three weeks. Dr. Gireesan continued to find the claimant unable to work.

The claimant underwent CT discography at Northwestern on January 3, 2005. Dr. Gireesan reviewed the results of the procedure on January 19, 2005, and his diagnosis remained unchanged. He recommended that the claimant continue with cardiovascular conditioning.

When the claimant saw Dr. Gireesan on July 26, 2005, he reported that he was still experiencing sharp back pain. Dr. Gireesan again prescribed pain medication and discussed various treatment options with the claimant.

At the arbitration hearing, the claimant testified that he continues to experience very sharp low-back pain that has not changed "much" since the date of his original injury. He stated that the pain is constant and that it gets worse when he is sitting or driving for more than 15 minutes or is jarred. Other activities which the claimant stated increased his pain include bending, twisting, trunk rotation, sneezing, coughing, and bowel movements. The claimant testified that he uses ice packs, heat, and massage therapy to relieve the pain. He also wears a TENS unit every day and a back brace packed with ice if he is going to be away from home for an extended period of time. According to the claimant, he also experiences weakness and numbness in his right leg and numbness in his foot.

The claimant admitted that, while convalescing, he obtained a master's in business administration (MBA) degree from Northwestern

University. The claimant, however, testified to the numerous accommodations that were provided for him by the university. According to the claimant, he was given a podium to allow him to stand through class, he was permitted to leave throughout the lectures and lie down on a couch in the lounge, and ice packs were stored for him in the university's freezer. Additionally, Northwestern University provided him with faculty parking next to the building and paid his classmates to take notes if he was unable to attend class. The claimant was also allowed additional time to complete his tests or was allowed to take the tests at home.

Judith Sher, a certified vocational rehabilitation counselor, testified that the claimant is permanently and totally disabled from the labor market "as he is today medically." She testified that she based her opinion on the limitations that the claimant's medical condition place on his activities. Of particular note is the claimant's restriction to lifting no more than 10 to 15 pounds and the increase in his pain level when he climbs, stoops, kneels, crouches, or drives for longer than 15 minutes. Sher also found significant the fact that the claimant needed to change positions frequently and lie down at times. Sher testified that she conducted a detailed interview of the claimant on May 28, 2004, and reviewed his medical records, Dr. Gireesan's deposition, Dr. Pahwa's reports, and the Social Security Administration decision awarding the claimant disability benefits. Thereafter, she performed a transferable skills analysis and a labor market survey. After identifying the claimant's transferable skills, Sher concluded that the labor market survey did not reveal any jobs which the claimant could perform. According to Sher, the jobs for which the claimant had transferable skills required extensive sitting, changes of position, travel, and social activities. Sher opined that the claimant would not be a candidate for the jobs within his transferable skills "mainly based on his physical restrictions." Sher testified that it would be unlikely that an employer would hire the claimant over an able-bodied candidate and, if he were hired, it was her opinion that he would "not have the ability to continue." Sher noted that her findings were consistent with the Social Security Administration's conclusions that the claimant's impairment significantly limits his ability to perform basic work activities, that he is unable to perform any past relevant work, that his skills do not transfer to other occupations within his residual functional capacity, and that there are no other jobs existing in significant numbers in the national economy that the claimant can perform. On cross-examination, Sher admitted that she was aware that the claimant had earned an MBA degree during his period of disability. She stated that she understood that it took the claimant longer

than customary to obtain the degree and that the university made accommodations for his physical requirements. Sher also admitted that she had not explored jobs in fields other than those for which the claimant possessed transferable skills. However, she testified that she would have the same opinions of anyone with the claimant's restrictions, regardless of skill level. On this point the following questions were asked of Sher, and she gave the following answers:

"Q. Now, did you have occasion to explore jobs in fields other than those you identified in your direct testimony?

A. No.

Q. So you didn't explore non-skilled jobs?

A. No.

Q. Did you feel that he could perform any lesser skilled jobs?

A. As far as any structural type jobs, construction jobs, labor type jobs, they certainly wouldn't be considered because the weight lifting is generally heavier.

Q. How about jobs that don't involve weight lifting, I mean, certainly you place people with far lesser employment and educational background with similar restrictions, do you not?

A. Do I place people with similar restrictions who—

Q. Who have like an [sic] high school education?

A. Depending on the restrictions, right, depending on what the restrictions are. If I worked with anyone with these restrictions, I would have the same results, it wouldn't matter."

At the hearing, pay stubs were received in evidence reflecting that the claimant received $1,931.82 in salary for the pay period ending June 30, 2000, $2,167 representing his first month's nonrecoverable draw, and $2,833.33 in salary for the pay period ending July 31, 2000. A pay stub for the period ending July 31, 2000, reflecting an additional payment of $1,625 was also admitted into evidence. The stub labeled the payment as being for "commission." However, Mace testified that the claimant received the second month's nonrecoverable draw plus a commission for net new monthly revenue although he had made no sales during the period.

Following the arbitration hearing, the arbitrator issued a decision in which he found that the claimant sustained injuries which arose out of and in the scope of his employment with Ameritech and that he gave timely notice of his accident. The arbitrator awarded the claimant temporary total disability (TTD) benefits under the Act for a period of 215¹/₇ weeks, covering the periods from August 8, 2000, through December 28, 2001, and March 1, 2001, through October 22, 2004. The arbitrator also found that the injuries which claimant sustained rendered him permanently and totally disabled and, as a consequence, awarded him permanent total disability (PTD) benefits

for life pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2004)), commencing on October 23, 2004. Finding that the claimant's average weekly wage (AWW) at the time of his injury was $1,190.81, the arbitrator fixed the claimant's TTD and PTD benefits at $793.87 per week. The arbitrator also ordered Ameritech to pay $30,281.54 for necessary medical expenses incurred by the claimant.

Ameritech sought a review of the arbitrator's decision before the Commission. In a unanimous decision, the Commission affirmed and adopted the arbitrator's decision in all relevant respects.

Ameritech sought judicial review of the Commission's decision in the circuit court of Cook County. The circuit court issued a written memorandum decision and judgment order on April 24, 2008, confirming the Commission's decision in all respects. Thereafter, Ameritech filed the instant appeal.

Ameritech does not contend that the claimant's condition of ill-being did not arise out of and in the course of his employment. Rather, it argues that the Commission erred in awarding the claimant PTD benefits. Ameritech asserts that the award is both against the manifest weight of the evidence and erroneous as a matter of law. We reject both contentions.

The question of whether a claimant is permanently and totally disabled is one of fact to be resolved by the Commission, and its resolution of the issue will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 288-89, 447 N.E.2d 842 (1983). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992). Whether a reviewing court might reach the same conclusion is not the test of whether the Commission's determination of a question of fact is supported by the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the Commission's determination. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

In *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286-87, 447 N.E.2d 842 (1983), the supreme court held:

"[A]n employee is totally and permanently disabled when he 'is unable to make some contribution to the work force sufficient to justify the payment of wages.' [Citations.] The claimant need not, however, be reduced to total physical incapacity before a permanent total disability award may be granted. [Citations.] Rather, a person is totally disabled when he is incapable of performing services except those for which there is no reasonably stable market. [Citation.]"

If, as in this case, a claimant's disability is not so limited in nature that he his not obviously unemployable, or if there is no medical evidence to support a claim of total disability, to be entitled to PTD benefits under the Act, the claimant has the burden of establishing the unavailability of employment to a person in his circumstances; that is to say that he falls into the "odd-lot" category. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47, 419 N.E.2d 1159 (1981); *A.M.T.C. of Illinois, Inc., Aero Mayflower Transit Co. v. Industrial Comm'n*, 77 Ill. 2d 482, 490, 397 N.E.2d 804(1979). The claimant can satisfy his burden of proving that he falls into the "odd-lot" category by showing diligent but unsuccessful attempts to find work or by showing that he will not be regularly employed in a well-known branch of the labor market. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544, 865 N.E.2d 342 (2007).

The claimant admits that he did not perform a job search. Ameritech asserts, and the claimant admits, that the Commission awarded PTD benefits based upon the premise that the claimant falls into the "odd-lot" category.

In determining whether a claimant falls within an "odd-lot" category for purposes of an award of PTD benefits, the Commission should consider the extent of the claimant's injury, the nature of his employment, his age, experience, training, and capabilities. *A.M.T.C. of Illinois, Inc.*, 77 Ill. 2d at 489.

According to Dr. Gireesan, the claimant could no longer perform his previous job. The doctor concluded that the low-back pain that the claimant experiences as a consequence of his work-related accident results in him being restricted from lifting more than 10 to 15 pounds, from frequent bending or twisting, and from driving for more than 15 minutes at a time. Dr. Pahwa, Ameritech's medical expert, also opined that the claimant should be restricted to lifting no more than 15 pounds. The claimant testified to the constant pain from which he suffers and that the pain increases when he sits or drives for more than 15 minutes, bends, twists, coughs, or has a bowel movement.

Sher, the claimant's vocational rehabilitation expert, opined that he was permanently and totally disabled. Her opinion in this regard was based largely upon the restrictions placed upon the claimant's work activities by Dr. Gireesan, the constant pain that the claimant experiences, and the increase in his pain level when he performs activities such as climbing, stooping, kneeling, crouching, and driving longer than 15 minutes. She also found significant the claimant's need to change positions frequently and his need to lie down to relieve pain. She rendered her opinion knowing that the claimant was approximately 30 years old at the time that she interviewed him and

that he had earned an MBA degree from Northwestern University while off of work following his accident. According to Sher, she performed a transferable skills analysis which revealed that the claimant is a skilled worker with an above average level of abilities and capable of learning. Specifically, Sher found that the claimant has transferable skills in the areas of accounting, finance, marketing, and customer service. Sher testified that she also performed a labor market survey looking for jobs which would make use of the claimant's transferable skills. She concluded, however, that, due to his physical limitations and restrictions, the claimant would not be a candidate for any of the jobs which she identified. Sher opined that it is unlikely that an employer would hire the claimant over an able-bodied candidate and, if he was hired, the claimant would not be able to continue working. On cross-examination, Sher admitted that she did not explore the availability of any nonskilled jobs for the claimant. However, she testified that her opinion as to the availability of meaningful employment would be the same for anyone with the claimant's restrictions, regardless of their skill level.

Ameritech argues that the Commission's award of PTD benefits is against the manifest weight of the evidence because the claimant failed to meet his burden of establishing that he falls into the "odd-lot" category. It asserts that Sher's testimony, although sufficient to establish that the claimant is unemployable in the fields of finance, marketing, and customer service, is insufficient to establish that he cannot obtain work in other skilled or nonskilled positions. We believe, however, that Sher's testimony on cross-examination to the effect that her opinions would be the same for anyone with the same restrictions as the claimant, regardless of skill level, belies Ameritech's assertion in this regard. Taken as a whole, the medical evidence coupled with Sher's opinion is sufficient to satisfy the claimant's burden of establishing that he falls into an "odd-lot" category for purposes of determining his entitlement to PTD benefits. We arrive at this conclusion notwithstanding the fact Patricia Cole, Ph.D., a psychologist at RIC, opined that the claimant's vocational experience and education made his return to work realistic. Cole never performed a labor market study or commented upon the effect of the claimant's physical limitations and restrictions upon his ability to obtain and hold work in a well-known branch of the labor market. Rather, Cole's opinion was rendered as part of a psychological evaluation to ascertain the impact of the claimant's chronic pain upon his life.

■ Once the claimant initially established that he falls into the "odd-lot" category, the burden shifted to Ameritech to show that some kind of suitable work is regularly and continuously available to the

claimant. *Valley Mould & Iron Co.*, 84 Ill. 2d at 547. This Ameritech failed to do. Ameritech did not introduce the testimony of any vocational rehabilitation expert to contradict Sher. As for Ameritech having offered the claimant employment within his restrictions, the claimant testified that no such offer was ever made. Although Fry testified that the Retention Account Executive position offered to the claimant complied with his doctor's restrictions, the Commission concluded that it did not. The Commission rested its conclusion in this regard upon a finding that the claimant's testimony was credible and Fry's was not. It was the Commission's function to judge the credibility of the witnesses and resolve their conflicting testimony. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980).

Based upon the foregoing analysis, we find that the Commission's award of PTD benefits is not against the manifest weight of the evidence.

■ Ameritech also argues that the award of PTD benefits is contrary to law, contending that the Commission applied an incorrect standard of proof. Ameritech asserts that the Commission held that evidence of an employer's failure to provide a claimant with vocational rehabilitation services or to offer employment within a claimant's postinjury restrictions is sufficient to satisfy the claimant's burden of proof to establish his right to PTD benefits under an "odd lot" theory. However, our reading of the arbitrator's decision which the Commission adopted fails to support Ameritech's assertion in this regard.

Ameritech points to a statement in the arbitrator's decision stating that the "tipping point" in his finding in favor of the claimant "as more probably true than not being entitled to this Award" is Ameritech's failure to offer the claimant employment within his doctor's restrictions or, in the alternative, to provide the claimant with vocational rehabilitation services. The comment immediately follows the arbitrator's assertion that he had "carefully reviewed all of the evidence," and the comment precedes a 12-page recitation of facts supporting the ultimate conclusion that the claimant "has been rendered wholly and permanently incapable of work as a result of his August 7, 2000 accident."

The claimant argues that the "tipping point" statement relied upon by Ameritech is nothing more than a statement of facts which persuaded the arbitrator to find that the evidence established that it was more probably true than not that the claimant was permanently and totally disabled. He contends that the arbitrator never found that either Ameritech's failure to provide him with vocational rehabilitation services or its failure to offer him employment within his doctor's restrictions standing alone justified an award of PTD benefits. We agree with the claimant.

■ Ameritech also argues that the Commission's reliance upon its failure to comply with Rule 7110.10 of the Rules Governing Practice Before the Illinois Workers' Compensation Commission (50 Ill. Adm. Code §7110.10 (2004)) in support of its decision is contrary to law. Ameritech points to three statements in the arbitrator's decision which the Commission adopted that refer to its failure to comply with the provisions of Rule 7110.10. The first is the "tipping point" comment referenced above. The second states that it is "unfortunate" Ameritech chose not to comply with Rule 7110.10 and develop and implement a program to facilitate the claimant's gradual reentry into the work force. The third comment referenced by Ameritech is the statement that "[i]t appears that *** [Ameritech] was more interested in monitoring *** [the claimant] for production purposes than in facilitating his return to work." According to Ameritech, as it had no obligation to vocationally rehabilitate the claimant, it was under no obligation to comply with Rule 7110.10.

Rule 7110.10 of the Rules Governing Practice Before the Illinois Workers' Compensation Commission requires an employer, in consultation with an injured employee and his representative, to prepare a "written assessment of the course of medical care, and, if appropriate, rehabilitation required to return the injured worker to employment when it can be reasonably determined that the injured worker will, as a result of the injuries, be unable to resume the regular duties in which engaged at the time of injury." 50 Ill. Adm. Code §7110.10(a) (2004). The rule goes on to provide that every four months after the preparation of a written assessment concluding that no plan or program of vocational rehabilitation was then necessary, the employer, in consultation with an injured employee and his representative, shall prepare a written review of the appropriateness of that conclusion if the injured employee was and has remained totally incapacitated for work. 50 Ill. Adm. Code §7110.10(c)(1) (2004). From a reading of the rule, it is clear that such written assessments are required even in circumstances where no plan or program of vocational rehabilitation is necessary.

Ameritech's entire argument on this issue appears to be premised upon the assertion that, under the test outlined by the supreme court in *National Tea Co. v. Industrial Comm'n*, 97 Ill. 2d 424, 432-33, 454 N.E.2d 672 (1983), the claimant never qualified for vocational rehabilitation. However, as noted earlier, Rule 7110.10 requires the preparation of a written assessment even in circumstances where no plan or program of vocational rehabilitation is necessary or appropriate. Consequently, the premise underlying Ameritech's objection to the arbitrator's comments concerning its failure to comply with Rule

7110.10 is faulty. More important to our disposition, however, is the fact that the three comments which Ameritech finds objectionable seem to have been made in passing. The arbitrator's decision which the Commission adopted contains a lengthy recitation of a substantial body of evidence supporting the ultimate conclusion that the claimant is permanently and totally disabled. We will affirm a decision of the Commission if there is any basis in the record to do so, regardless of whether the Commission's reasoning is correct or sound. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 793, 670 N.E.2d 1122 (1996).

■ Next, Ameritech argues that the Commission's award of TTD benefits for the period following November 6, 2000, is against the manifest weight of the evidence. Ameritech contends that the claimant was offered a position as a Retention Account Executive on November 6, 2000, that complied with his doctor's restrictions. The claimant testified, however, that the position required him to carry 50 pounds of demonstration equipment and to travel to his territory to see customers. As noted earlier, the Commission made a credibility finding in support of its conclusion that the position offered to the claimant did not comply with his restrictions. Credibility is a question reserved for the Commission's determination (*O'Dette*, 79 Ill. 2d at 253), and we cannot say based upon the record before us that its resolution of the issue is against the manifest weight of the evidence. We conclude, therefore, based upon the Commission's finding that the claimant was not offered a position that complied with his doctor's restrictions, that the award of TTD benefits for the period following November 6, 2000, is not against the manifest weight of the evidence.

■ Finally, Ameritech argues that the Commission's calculation of the claimant's AWW is contrary to law. It contends that the Commission improperly included the nonrecoverable draws which the claimant received as earnings for purposes of calculating his AWW. However, Ameritech cites no authority for its contention in this regard. Supreme Court Rule 341(h)(7) requires a party to provide citations to relevant authority supporting arguments advanced on appeal. 210 Ill. 2d R. 341(h)(7). Because Ameritech failed to support this argument with citations to authority, the argument has been forfeited for purposes of this appeal. *Bigelow v. City of Rolling Meadows*, 372 Ill. App. 3d 60, 64, 865 N.E.2d 221 (2007); *Ruback v. Doss*, 347 Ill. App. 3d 808, 816, 807 N.E.2d 1019 (2004).

Also contained within Ameritech's argument on AWW is the assertion that, even if the nonrefundable draw which the claimant received is included as earnings for purposes of calculating AWW, the Commission made a mathematical error in fixing the claimant's AWW at

$1,190.81. According to Ameritech, the salary which the claimant received prior to his accident plus the two nonrefundable draws which he received divided by the 7¹/₇ weeks which the claimant worked prior to his injury is $1,108.79. Absent from Ameritech's calculation, however, is the additional $542 that the claimant received for the period ending July 31, 2000, and which Mace testified was a commission for net new monthly revenue. Ameritech has failed to address the propriety of the inclusion of this additional sum as earnings for purposes of calculating the claimant's AWW. Consequently, we are unable to address Ameritech's contention that the Commission made a mathematical error in computing the claimant's AWW even when his nonrefundable draws are included as earnings

For his part, the claimant, taking into account the entire $1,625 which he received for the period ending July 31, 2000, contends that his AWW should properly have been calculated at $1,197.98. However, he never filed a cross-appeal raising the issue.

We conclude, therefore, that the issues raised concerning the Commission's calculation of the claimant's AWW have been waived for purposes of this appeal.

Based upon the foregoing analysis, we affirm the judgment of the circuit court which confirmed the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and HUDSON, HOLDRIDGE, and DONOVAN, JJ., concur.