# Illinois Official Reports

## Appellate Court

*Lenhart v. Illinois Workers' Compensation Comm'n*,
2015 IL App (3d) 130743WC

| | |
|---|---|
| Appellate Court Caption | KENNETH LENHART, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (USF Holland, Appellee). |
| District & No. | Third District<br>Docket No. 3-13-0743WC |
| Filed | March 20, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 12-MR-1596; the Hon. Theodore Jarz, Judge, presiding. |
| Judgment | Reversed in part, affirmed in part, cause remanded. |
| Counsel on Appeal | David W. Olivero, of Louis E. Olivero & Associates, of Peru, for appellant.<br><br>John Campbell, of Keefe, Campbell & Associates, LLC, of Chicago, for appellee. |

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

## OPINION

¶ 1        The claimant in a workers' compensation case, Kenneth Lenhart, appeals a finding by the Illinois Workers' Compensation Commission (the Commission) that he failed to prove that he is permanently and totally disabled because of a workplace accident. Alternatively, he argues that the Commission erred in failing to determine whether he was entitled to a permanent partial disability (PPD) benefit award based on a wage differential calculation, rather than a percentage of a person as a whole award. For the following reasons, we agree with the latter argument, reverse the Commission's PPD award, and remand for a determination of whether the claimant is entitled to a PPD award based on a wage differential calculation.

¶ 2                                    BACKGROUND
¶ 3        The claimant worked for the employer, USF Holland, as a dockworker and truck driver. In December 2004, the claimant injured his low back in a workplace accident, underwent a course of medical treatments, and filed an application for adjustment of claim pursuant to the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2004)).

¶ 4        At the arbitration hearing, the parties disputed the extent of the claimant's injuries. The claimant presented evidence, including medical opinions from his treating physicians, in an attempt to show that he is permanently and totally disabled. The employer does not dispute that the claimant sustained a workplace accident, that he suffered conditions of ill-being to his back because of the accident, or that he can no longer perform the same physical demand level as a result of the accident. The employer stipulated that the claimant cannot meet the physical demands of a dockworker/truck driver as a result of his accident, but disputed the claimant's assertion that he is totally and permanently disabled. The employer presented evidence and opinions that the claimant exaggerated his physical limitations. The employer's evidence included videotape surveillance evidence showing the claimant engaged in various physical activities since the accident.

¶ 5        The claimant's workplace accident occurred on December 14, 2004, when he drove a forklift over a dock plate that buckled. The accident caused a jarring force to his low back. The claimant immediately experienced low back pain, which became worse over the next few days. He testified that prior to this accident, he was in good health. After the accident, the claimant underwent a significant amount of medical treatments, including injections, physical therapy, and two back surgeries, because of continuous low back pain. In addition, the claimant underwent multiple independent medical examinations (IMEs).

¶ 6        The record on appeal includes the surveillance video footage that the employer obtained and spanned an approximate three-year period from October 2007 through October 2009. The surveillance video footage showed the claimant engaged in numerous physical activities,

including riding a motorcycle, attending football games, yard work, and some lifting and bending activities.

¶ 7     One of the claimant's treating physicians, Dr. George DePhillips, concluded that the claimant was permanently and totally disabled from work even after viewing some of the surveillance videos. During his evidence deposition, Dr. DePhillips explained that the claimant could obviously perform some work, "but the question is, how many hours a day and what are his restrictions, and at some point a patient has restrictions that deem them unemployable." He admitted that he based his opinions about the claimant's restrictions, in part, on the claimant's subjective reporting of his condition.

¶ 8     The claimant's psychiatrist, Dr. Greg Hawley, diagnosed the claimant as having chronic pain disorder secondary to low back pain along with depression and impulse control disorder. Dr. Hawley believed that the claimant's conditions were causally related to the workplace accident.

¶ 9     At the request of the employer, Dr. Fransisco Espinosa conducted an IME of the claimant in January 2008, and he found that the claimant was at maximum medical improvement (MMI) at that time. He believed that the claimant was ready to work and could occasionally lift up to 25 pounds, could occasionally sit, and must avoid bending and twisting at the waist. In his opinion, these were permanent restrictions. Dr. Espinosa viewed some of the video surveillance of the claimant performing yard work on several occasions, and opined that the activities in the video did not "correlate with his alleged current symptoms." The doctor concluded that the claimant was capable of performing light- to medium-level work.

¶ 10     At the request of the employer, a clinical psychologist, Ronald Gahellen, also performed an IME. Gahellen examined the claimant, reviewed the claimant's medical records, and administered a number of objective tests to measure his personality, intellectual functioning, and emotional functioning. Gahellen concluded that during his examination, the claimant "responded in a guarded, self-favorable manner and made an effort to control the impression formed of him." He believed that the claimant's condition involved "a significant psychological component" and that the claimant "appeared invested in remaining in a role as an invalid due to medical problems." Gahellen also noted that the surveillance tapes that he reviewed showed the claimant "interacting in a comfortable, natural manner with other people." This raised a concern with Gahellen that the claimant's self-reported "limitations in functioning may be misleading and exaggerated."

¶ 11     The claimant underwent a functional capacity evaluation (FCE) in April 2009, which showed that the claimant could work at the "Very Light" physical demand level. He underwent a second FCE over a two-day period in May 2009. This FCE determined that the claimant could perform at the sedentary level with occasional lifting up to 15 pounds, walking limited to 10 minutes, and standing 30 minutes. The therapist commented that the claimant "demonstrated significant inconsistency of postural restriction and movement patterns throughout the course of the evaluation." He believed that the claimant had significant nonorganic components to his level of pain and disability.

¶ 12     During the course of the claimant's medical treatments, the employer hired a vocational rehabilitation company, E.P.S. Rehabilitation, which performs vocational rehabilitation services. E.P.S. Rehabilitation performed a "Limited Telephonic Employer Sampling" of 16 businesses from the claimant's general area. A vocational rehabilitation counselor at E.P.S. Rehabilitation, Duane Bigelow, testified in an evidence deposition that the sampling is only a

snapshot of employment opportunities, which may or may not be available at a point in time. Two of the sixteen businesses included in the sampling reported job openings, and both openings were for service/parts managers. One opening required lifting 30 to 40 pounds, and the other position required alternate sitting and standing all day.

¶ 13 The claimant hired his own vocational specialist, Ron Malik, who opined that the two jobs available in E.P.S. Rehabilitation's sampling were outside the claimant's physical limitations. He also opined that if the claimant was released to work, he needed to work at the light physical demand level with no significant postural functions such as bending, stooping, crouching, or crawling. According to Malik, the claimant required a job with low stress, simple and repetitive tasks, and limited contact with the public, coworkers, and supervisors. Malik concluded that the claimant was unemployable without education and/or training for a new career.

¶ 14 On June 15, 2009, Bigelow began assisting the claimant with a self-directed job search. In July 2009, upon Bigelow's recommendation, the employer approved an introductory computer class for the claimant. The claimant subsequently took two eight-week computer courses and received passing grades in both classes.

¶ 15 Another vocational rehabilitation counselor from E.P.S. Rehabilitation, Edward P. Steffan, testified that he believed that the claimant was employable in the current labor market within his restrictions. When asked to explain his opinion, he testified as follows: "His rehabilitation variables, which we describe as his age, which is approximately 40 years, his available physical capabilities as we've discussed, his level of education, his training, his previous experience and acquired skills and knowledge allow him access to a readily available and stable labor market at positions in which he could earn between $10 and $15 per hour." He opined that the top-earning capacity for the claimant was $33.65 per hour, but that he did not want to say that the claimant would be employable between $15 and $33.65 per hour because "that could be somewhat misleading."

¶ 16 During his deposition testimony, Bigelow testified that they established a broader range of $8 to $33.65 per hour as the claimant's earning potential based on a "snapshot" of the labor market at a particular time. However, he believed that "the more likely median" would be the $10 to $15 range. Likewise, Steffan testified that $10 to $15 per hour was the "median or mean extracted from" the larger range of $8 and $33.65 per hour. He was "confident" that $10 to $15 per hour was "a very realistic and achievable wage for [the claimant]." A report dated January 27, 2010, and signed by both Steffan and Bigelow stated that the claimant "is both placeable and employable in positions earning between $10.00 and $15.00 per hour."

¶ 17 Steffan testified that during the time that he assisted with the claimant's job search, the claimant told potential employers "inappropriate information regarding his available physical capabilities" which resulted in "sabotaging" any realistic chance of being considered as a valid applicant for employment. He believed that an individual who in good faith was trying to gain employment would not make these types of comments to potential employers.

¶ 18 At the conclusion of the arbitration hearing, the arbitrator found that the claimant's conditions of ill-being, including the condition of his low back and his mood disorder and depression, were causally related to the workplace accident. The arbitrator awarded the claimant medical expenses and TTD benefits.

¶ 19 With respect to the nature and extent of the claimant's injury, the arbitrator found that the claimant proved that he was permanently and totally disabled (PTD) as a result of the

work-related accident under an odd-lot theory. The employer appealed the arbitrator's decision to the Commission.

¶ 20     In its brief on review filed with the Commission, the employer asked the Commission to reverse the arbitrator's PTD benefits award and "enter judgment awarding [the claimant] wage differential benefits based upon the $30 per hour jobs Mr. Steffan testified [the claimant] would be currently capable of earning." The claimant did not argue that he was entitled to a PPD award based on a wage differential calculation, but instead requested the Commission to affirm the arbitrator's PTD award.

¶ 21     The Commission reversed the arbitrator's PTD award and modified the arbitrator's award with respect to the nature and extent of the claimant's injury. It affirmed and adopted all other aspects of the arbitrator's decision. The Commission unanimously found that the claimant failed to prove that he was permanently and totally disabled. The Commission noted that the record contains medical opinions that the claimant was unable to work, but it found that those opinions were contradicted by the surveillance videos "showing [the claimant] to be far more physically and mentally capable than his treating physicians were led to believe."

¶ 22     The Commission found that Dr. DePhillips's opinion that the claimant was permanently and totally disabled was unreliable in light of the surveillance footage, which was "counter to Dr. DePhillips's understanding of [the claimant's] capabilities." The Commission also noted that the claimant's psychiatrist, Dr. Hawley, reviewed some of the surveillance video and admitted that the claimant appeared significantly more mobile in the video footage than he was in his office and engaged in more social interaction than what the claimant reported being able to do.

¶ 23     The Commission concluded that the claimant exaggerated his functional incapacity to his treating physicians. It found that the most reliable medical opinions were the opinions of the employer's IME doctor, Dr. Espinosa, who concluded that the claimant could return to work with a 25-pound lifting restriction at the light end of the light-medium demand level. The Commission also relied on the report of the employer's IME psychologist, Gahellen, who administered a number of tests that indicated that the claimant was exaggerating his functional limitations. The Commission noted that Gahellen testified that the surveillance footage undermined the claimant's subjective reports of his capabilities.

¶ 24     The Commission found the claimant's testimony to be unreliable and that expert opinions based on the claimant's subjective reporting of his capabilities were, likewise, unreliable. The Commission stated:

>      "We find it likely that [the claimant] is readily capable of pursuing additional training and job searching. While we note that the job search logs show that [the claimant] contacted a large number of potential employers, we also note numerous days when [the claimant] reported being in too much pain to pursue his job search. We note that [the claimant] focused a significant amount of time and energy on defending himself against perceived attacks from Mr. Steffan and [the employer]. After reviewing the evidence, particularly the surveillance footage, we find the discrepancy between what [the claimant] claims to be capable of doing and what he is actually capable of doing is vast, and therefore we decline to find that he is permanently and totally disabled under an odd lot theory."

¶ 25     The Commission noted that the claimant had a 25-pound lifting restriction and exhibited some difficulties obtaining work within his restrictions. As noted above, in its brief on

review, the employer requested the Commission to enter a wage differential award. The Commission, however, did not analyze whether the claimant was entitled to receive a wage differential award, but instead concluded that the claimant was "entitled to permanent partial disability benefits representing 75% loss of use of the whole person."

¶ 26   The claimant appealed the Commission's decision to the circuit court. The circuit court entered a judgment confirming the Commission's decision. The claimant now appeals the circuit court's judgment and raises two alternative issues on appeal. First, the claimant argues that the Commission's finding that he failed to prove that he was entitled to PTD benefits was against the manifest weight of the evidence. Second, the claimant advances an alternative argument that the Commission erred in failing to consider his right to receive PPD benefits based on a wage differential award.

¶ 27                                ANALYSIS
¶ 28                                   I
¶ 29              Nature and Extent of Injury: Odd-Lot Theory

¶ 30   The first issue that the claimant raises on appeal is that the Commission's finding that he failed to prove that he was permanently and totally disabled pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2012)), under an odd-lot theory, was against the manifest weight of the evidence. The record, however, supports the Commission's finding that the claimant failed to prove that he was permanently and totally disabled under an odd-lot theory.

¶ 31   The claimant has the burden of establishing the nature and extent of his injury by a preponderance of the evidence. *Chicago Park District v. Industrial Comm'n*, 263 Ill. App. 3d 835, 843, 635 N.E.2d 770, 776 (1994). This is a factual question to be determined by the Commission. *Oscar Mayer & Co. v. Industrial Comm'n*, 79 Ill. 2d 254, 256, 402 N.E.2d 607, 608 (1980). Accordingly, the initial determination of whether a claimant is permanently and totally disabled under section 8(f) of the Act is a question of fact to be determined by the Commission, and its determination on this issue cannot be overturned on review unless it is against the manifest weight of the evidence. *Economy Packing Co. v. Illinois Workers' Compensation Comm'n*, 387 Ill. App. 3d 283, 293, 901 N.E.2d 915, 924 (2008). "For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal." *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315, 901 N.E.2d 1066, 1081 (2009).

¶ 32   An employee need not be reduced to complete physical incapacity to be entitled to PTD benefits. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286, 447 N.E.2d 842, 845 (1983). Instead, a PTD award is proper when the employee can make no contribution to industry sufficient to earn a wage. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544, 865 N.E.2d 342, 357 (2007). "The focus of the Commission's analysis must be upon the degree to which the claimant's medical disability impairs his employability ***." *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534, 668 N.E.2d 21, 24 (1996). A person is not entitled to PTD benefits if he is qualified for and capable of obtaining gainful employment without seriously endangering his health or life. *Interlake, Inc. v. Industrial Comm'n*, 86 Ill. 2d 168, 176, 427 N.E.2d 103, 107 (1981).

¶ 33    As noted above, the issue the claimant raises on appeal concerns whether he established that he is permanently and totally disabled under the odd-lot category. The odd-lot category for purposes of a PTD award arises when a "claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability." *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47, 419 N.E.2d 1159, 1163 (1981). In these situations, the claimant can establish that he is entitled to PTD benefits under the odd-lot category by proving the unavailability of employment to persons in his circumstances. *Ameritech Services, Inc. v. Illinois Workers' Compensation Comm'n*, 389 Ill. App. 3d 191, 204, 904 N.E.2d 1122, 1133 (2009).

¶ 34    "The claimant ordinarily satisfies his burden of proving that he falls into the 'odd lot' category in one of two ways: (1) by showing diligent but unsuccessful attempts to find work, or (2) by showing that because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market." *Westin Hotel*, 372 Ill. App. 3d at 544, 865 N.E.2d at 357. If the claimant establishes that he fits into the odd-lot category, the burden shifts to the employer to prove that the claimant is employable in a stable labor market and that such a market exists. *Id.*

¶ 35    In the present case, the Commission viewed the surveillance videos and detailed its findings based on the contents of the video footage. We have also viewed the surveillance videos and conclude that the videos support the Commission's findings with respect to their content. In assessing the claimant's credibility with respect to his capabilities, the Commission compared the claimant's self-reported limitations with the activities depicted in the surveillance videos. The Commission concluded that the claimant's activities shown in the videos were not "the activities of a man who is unable to stand or sit without great pain." The Commission found that the claimant significantly exaggerated his reporting of the extent of his injury and that he was not credible. The assessment of the claimant's credibility and the weight to be given to his testimony lies solely within the province of the Commission. *Gilster Mary Lee Corp. v. Industrial Comm'n*, 326 Ill. App. 3d 177, 184, 759 N.E.2d 979, 984 (2001).

¶ 36    Moreover, the Commission's finding with respect to the claimant's testimony was significant because, as the Commission found, much of the medical opinion testimony that the claimant relied on to meet his burden was based on his own subjective reporting of his capabilities to his medical providers. The Commission found the opinion testimony of Dr. DePhillips to be "unreliable" because the claimant's activities that he performed "in the surveillance videos runs counter to Dr. DePhillips's understanding of the claimant's disabilities." In addition, the Commission found it significant that after the claimant's treating psychiatrist, Dr. Hawley, viewed some of the surveillance video, he opined that the claimant appeared to be more mobile in the video than he was in his office. In addition, Dr. Hawley noted that the claimant engaged in social interaction more than he reported being able to do.

¶ 37    The Commission weighed the conflicting medical opinions and concluded that the opinions of Dr. Espinosa and the employer's psychologist, Gahellen, were the most reliable. Nothing in the record compels us to second-guess the Commission's assessment of this medical testimony. After viewing the surveillance video, Dr. Espinosa concluded that the claimant could return to work with a 25-pound lifting restriction at the light end of the light-medium demand level.

¶ 38    The surveillance videos support the Commission's finding with respect to its resolution of the conflicting medical opinions and its determination that the claimant failed to prove that he was permanently and totally disabled. Therefore, we affirm that portion of the circuit court's judgment that confirmed the Commission's denial of PTD benefits.

¶ 39                                              II
¶ 40                      Calculation of PPD Benefits: Wage Differential
¶ 41    The claimant argues, alternatively, that the Commission erred in calculating his PPD benefits based on a percentage of the person as a whole rather than a wage differential calculation. We render no opinion on whether the claimant is entitled to a wage differential award; however, we believe that the Commission erred in failing to decide the issue on the merits. The employer raised the question of whether the claimant should receive a wage differential by arguing the issue in its brief before the Commission. In addition, it is an issue that appears from the evidence of record.

¶ 42    Section 8 of the Act governs the "amount of compensation which shall be paid to the employee for an accidental injury not resulting in death." 820 ILCS 305/8 (West 2012). Section 8(d) details two types of compensation for employees who are permanently and partially disabled; subparagraph (1) provides for a wage differential award and subparagraph (2) provides for a percentage of the person as a whole award. 820 ILCS 305/8(d) (West 2012); *Dawson v. Illinois Workers' Compensation Comm'n*, 382 Ill. App. 3d 581, 585, 888 N.E.2d 135, 138 (2008).

¶ 43    The supreme court has expressed a preference for wage differential awards. See *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 727, 734 N.E.2d 482, 487 (2000) (citing *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 438, 433 N.E.2d 671, 674 (1982)). The supreme court explained that "[i]t is often easier to calculate how much a claimant's earnings have decreased since the accident than to assign a percentage partial loss of use." *General Electric Co.*, 89 Ill. 2d at 437, 433 N.E.2d at 673-74. In *Gallianetti*, we held that "the plain language of section 8(d) prohibits the Commission from awarding a percentage-of-the-person-as-a-whole award where the claimant has presented sufficient evidence to show a loss of earning capacity." *Gallianetti*, 315 Ill. App. 3d at 728, 734 N.E.2d at 488.

¶ 44    In order to qualify for a wage differential award under section 8(d)(1) of the Act, a claimant must prove (1) a partial incapacity which prevents him from pursuing his "usual and customary line of employment" and (2) an impairment in earnings. *Id.* at 730, 734 N.E.2d at 489. The purpose of a wage differential award is "to compensate an injured claimant for his reduced earning capacity, and if the injury does not reduce his earning capacity, he is not entitled to such compensation." *Dawson*, 382 Ill. App. 3d at 586, 888 N.E.2d at 139. "A claimant must prove his actual earnings for a substantial period before his accident and after he returns to work, or in the event that he is unable to return to work, he must prove what he is able to earn in some suitable employment." (Internal quotation marks omitted.) *Id*.

¶ 45    Ordinarily, the issue of whether a claimant is entitled to a wage differential award is a question of fact for the Commission to determine, and its decision in the matter will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id*. However, we

review issues of statutory construction under the *de novo* standard of review. *Curtis v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120976WC, ¶ 13, 987 N.E.2d 407.

¶ 46    In the present case, the employer stipulated that the claimant could no longer meet the physical demands of his usual and customary line of employment as a dockworker/truck driver. Also, the employer's medical expert, Dr. Espinosa, opined that the claimant could return to work with a 25-pound lifting restriction at the light end of the light-medium demand level, and the Commission found Dr. Espinosa's opinion to be credible. Therefore, the record conclusively establishes the first requirement for a wage differential award.

¶ 47    With respect to the second requirement, reduced earning capacity, the employer's vocational rehabilitation experts, Steffan and Bigelow, opined that there was a readily available and stable labor market in which the claimant could obtain positions earning between $10 and $15 per hour.

¶ 48    The evidence in the record, therefore, supports a finding that the claimant was entitled to a wage differential award, *i.e.*, that he suffered a partial incapacity which prevents him from pursuing his usual and customary line of employment and that he has an impairment in earnings. The Commission, however, did not consider a wage differential award under section 8(d)(1), but instead awarded PPD benefits under section 8(d)(2). When the record establishes that an employee has suffered an impairment of earning capacity, section 8(d)(2) comes into play only when "the employee *elects to waive his right to recover* under *** subparagraph 1." (Emphasis added.) 820 ILCS 305/8(d)(2) (West 2012); *Gallianetti*, 315 Ill. App. 3d at 729, 734 N.E.2d at 488. Nothing in the record suggests that the claimant explicitly elected to waive his right to recover a wage differential award under section 8(d)(1).

¶ 49    Although the claimant did not request a wage differential award, we do not consider this a waiver of his right to recover a wage differential award. The claimant made no election concerning PPD benefits because he sought PTD benefits. The Commission should not consider the claimant's request for PTD to be an election with respect to unrequested PPD benefits, particularly when the employer itself asked the Commission to grant a wage differential award and when the record supports a wage differential award. As noted by the supreme court, a wage differential award is "often easier to calculate" than "a percentage partial loss of use." *General Electric Co.*, 89 Ill. 2d at 437, 433 N.E.2d at 673-74.

¶ 50    Furthermore, section 19(e) of the Act provides that the Commission shall "review the decision of the Arbitrator and all questions of law or fact which appear from the statement of facts or transcript of evidence." 820 ILCS 305/19(e) (West 2012). In the present case, the record shows that the claimant is functionally incapacitated and that his incapacitation resulted in a loss of earning capacity. Therefore, we believe that the question of the claimant's entitlement to an award under section 8(d)(1) appears from the evidence of record in this case and that the Commission erred in failing to consider a wage differential award.

¶ 51    The Commission found that the claimant carried his burden of showing his incapacitation. Also, the parties stipulated to the amount the claimant was earning at the time of his injury; the parties' request for a hearing included an agreement that the claimant's average weekly wage during the year preceding the injury was $1,339.66. The employer's vocational experts, in turn, supplied evidence that the claimant's post accident earning capacity was in the range of $10 to $15 per hour. See *Levato v. Illinois Workers' Compensation Comm'n*, 2014 IL App (1st) 130297WC, ¶ 28, 14 N.E.3d 1195 (in reversing the Commission's failure to consider a wage differential award, the court noted that "[o]n the

issue of earnings impairment, the Commission fixed the claimant's average weekly wage at $1,145.35, and [the employer's] own witness[ ] fixed the pay for positions appropriate for the claimant's present condition between $8 and $20 per hour").

¶ 52 We have previously held that if a claimant fails to present evidence regarding his entitlement to a wage differential award, then he implicitly waives his right to such an award. *Gallianetti*, 315 Ill. App. 3d at 729, 743 N.E.2d at 488. The present case is distinguishable, however, because even though the claimant did not pursue PPD benefits, the record, nonetheless, contains evidence relevant to the claimant's entitlement to a wage differential award. In addition, nothing in the record suggests that the claimant's request for PTD benefits should be construed as an election, express or implied, with respect to his rights to PPD benefits. In cases where a claimant unsuccessfully seeks PTD benefits and does not make an alternative request for PPD benefits, the claimant is still entitled to PPD benefits when the evidence supports such an award. Likewise, in such cases, we believe that the Commission is obligated to consider a wage differential award when there is evidence in the record that could support a wage differential award (regardless of which party presented the evidence), and when nothing in the record suggests that the claimant elected to waive his right to recover such an award.

¶ 53 Accordingly, we reverse that portion of the circuit court's judgment that confirmed the Commission's award of PPD benefits for 75% loss of the use of the person as a whole, vacate the Commission's PPD award, and remand the matter to the Commission with directions to decide the claimant's entitlement to a wage differential award on the merits. "In the event that Commission determines that the claimant is entitled to a wage differential award, it should make the award. If, on the other hand, the Commission decides that he is not entitled to a wage differential [a]ward under section 8(d)(1) of the Act, it is directed to reinstate its award of PPD benefits for [75]% loss of use of a person as a whole under section 8(d)(2)." *Levato*, 2014 IL App (1st) 130297WC, ¶ 30, 14 N.E.3d 1195.

¶ 54                                                      CONCLUSION

¶ 55 For the foregoing reasons, we reverse that portion of the circuit court's judgment which confirmed the Commission's award of PPD benefits of 75% loss of use of a person as a whole, affirm the circuit court's judgment in all other respects, vacate that portion of the Commission's decision which awarded the claimant PPD benefits pursuant to section 8(d)(2) of the Act, and remand this matter to the Commission with directions.

¶ 56 Reversed in part, affirmed in part, cause remanded.