FEDERAL MARINE TERMINALS, INC., Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Vincent Buza, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—06—1738WC

Opinion filed March 6, 2007.

1118

Garofalo, Schreiber, Hart & Storm, of Chicago (Gregory P. Sujack, of counsel), for appellant.

Law Offices of Robert H. Hanaford, of Chicago (Robert H. Hanaford and Brett J. Swanson, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

Federal Marine Terminals, Inc. (Federal Marine), appeals from an order of the circuit court of Cook County which confirmed a decision of the Illinois Workers' Compensation Commission (Commission) awarding benefits to Vincent Buza (claimant) under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)). For the reasons that follow, we affirm.

The claimant filed an application for adjustment of claim pursuant to the Act, seeking benefits for injuries he received on March 30, 1999,

while in the employ of Federal Marine. The facts relevant to our disposition of this appeal are taken from the evidence adduced at the arbitration hearing.

The claimant was born on June 28, 1947. As the result of a swimming accident when he was 14 years old, the claimant's right hand is paralyzed and he has a slight right-leg limp. According to the claimant, he is essentially left-handed. He does, however, use his right hand to hold or lift objects. One of his examining physicians described the claimant's right hand as functionally limited to a large extent.

In 1969, the claimant began working in the marine shipping industry as a cargo checker. In 1984, he began working for Federal Marine as a warehouse manager. The claimant's duties in that capacity included monitoring the loading and unloading of ships, the loading of trucks, and the inventory of cargo. He was also required to schedule work crews. As a warehouse manager, the claimant had supervisory authority over both longshoremen and checkers. Cargo which was moved to or from Federal Marine's terminal by truck and railcar was loaded onto, or unloaded from, ships with cranes operated by the longshoremen. Checkers are responsible for locating and identifying cargo and are also responsible for the paperwork relating to the receipt and delivery of the cargo. Approximately 70% of the claimant's time was spent in the warehouse and on the dock. He spent the remainder of his time doing paperwork. According to the claimant, he would only go onboard a ship in the course of his duties once or twice a year. Although the claimant did not physically load or unload cargo, he was required to walk, bend, and kneel while performing his duties. He stated that, on a busy day, he would walk more than five miles.

The claimant testified that, on March 30, 1999, he entered a dark warehouse to take an inventory. As he went to turn on the lights, he tripped over a piece of wood, falling forward. The claimant stated that he broke the fall with his hands and left knee and then rolled over on to his back. He testified that he immediately felt pain in his left knee.

The following morning, the claimant went to Trinity Hospital, complaining of pain in his left knee and left shoulder and a burning sensation in his fingers and left hand. Diagnostic images taken on that date showed no fractures or dislocations.

On April 3, 1999, the claimant came under the care of Dr. Richard Egwele, an orthopaedic surgeon. The claimant complained of pain in his left hand, shoulder, and knee. On that date, Dr. Egwele diagnosed traumatic left subdeltoid bursitis and soft tissue contusions to the claimant's left knee and hand.

On June 15, 1999, Dr. Charles Bush Joseph examined the claim-

ant at the request of Federal Marine. He diagnosed a probable left knee meniscal tear and a left rotator cuff strain. Although Dr. Bush Joseph noted that the claimant had a long-standing and complicated medical history, he was of the belief that "there was most likely some aggravation of his preexisting condition, as a result of the work-related injury in March, 1999." Dr. Bush Joseph recommended an arthroscopic debridement of the left knee. He noted no objective neurological findings referable to a lumbar spine injury.

On July 7, 1999, the claimant underwent a left knee arthroscopic meniscectomy and debridement, which was performed by Dr. Egwele. The claimant continued to treat with Dr. Egwele postoperatively.

The claimant was reevaluated by Dr. Bush Joseph on September 14, 1999. In a report of that examination, Dr. Bush Joseph noted that the claimant reported a 30% improvement in the condition of his left knee, mechanical pain in his low back, and left knee pain. He diagnosed chronic left shoulder pain, mechanical low back pain, and degenerative arthritis in the left knee. As of that date, Dr. Bush Joseph found that the claimant had reached maximum medical improvement and opined that he could return to work as a warehouse supervisor with permanent restrictions against lifting with his left upper extremities, kneeling, squatting, or climbing.

When the claimant was last seen by Dr. Egwele on October 28, 1999, he was still complaining of pain in his back, left shoulder, and left knee, and he was walking with a cane. As of that visit, Dr. Egwele authorized the claimant to return to modified duties with no lifting, prolonged standing, walking, squatting, or climbing.

On September 1, 2000, the claimant had an MRI of his cervical spine at the request of Dr. Kathryn A. Hanlon, a neurologist. The report of the test noted a prominent posterior vertebral body osteophyte from C4 through C6 which was compressing the anterior cord and spinal stenosis at C5-C6 and C6-C7. On September 12, 2000, the claimant had a CT scan of his spine at the request of Dr. Hanlon which revealed severe facet joint degenerative changes with a narrowing of the neural foramina at L4-L5 and L5-S1; spurring, causing an impression on the thecal sac on the left at L2-L3; mild borderline narrowing of the spinal canal at L3-L4; and diffuse bulging at L4-L5 and L5-S1.

On referral from Dr. Hanlon, the claimant was first seen at the Chicago Institute of Neurosurgery (CIN) on September 28, 2000. In a report of that visit, Dr. Marc A. Levin recorded a history of the claimant having suffered a fall on March 30, 1999, and thereafter developing low back pain and numbness in his left hand. Dr. Levin also noted that the claimant stated that, after his fall, he had diminished fine

motor movements in his right arm and leg. Dr. Levin diagnosed cervical spinal cord stenosis and lumbar stenosis. He ordered an MRI of the claimant's lumbar spine and recommended that the claimant undergo operations on both his cervical and lumbar spine.

On November 14, 2000, Dr. Mitchell Gropper and Dr. Levin operated on the claimant. The procedure was quite extensive, involving a C4 corpectomy, C5 corpectomy, a decompressive cervical laminectomy at C3-C7, a posterior osteotomy at C4 and C5, a posterior segmental fixation at C3-C7, the placement of a sibular strut graft from C3 to C6, and an anterior spinal instrumentation at C3-C7. The postoperative diagnosis was cervical spondylitic myelopathy.

The claimant continued to treat at CIN postoperatively. Dr. Gropper noted in his records that the surgery went well, but the claimant constantly complained of lumbar spinal stenosis and neurogenic claudication.

On December 7, 2001, the claimant was examined, at Federal Marine's request, by Dr. Edward Goldberg. He both examined the claimant and reviewed his medical records. In a report of that visit, Dr. Goldberg outlined the claimant's physical impairments and prior surgical procedures. He noted that the claimant had suffered a spinal contusion and traumatically induced myelopathy, but he, nevertheless, concluded that the claimant's lumbar condition is not related to his work accident. Dr. Goldberg reported that the claimant is not capable of returning to his former position as a warehouse manager, but that he is capable of sedentary work.

On December 17, 2001, Dr. Gropper performed an L4-L5 lumbar laminectomy on the claimant. The postoperative diagnosis was lumbar stenosis.

Dr. Gropper's evidence deposition was admitted into evidence at the arbitration hearing. He testified to the need for the surgery which he performed on the claimant. He diagnosed the claimant as suffering from cervical radiculopathy and myelopathy which resulted from his having rotated his spinal cord. The event caused his nerves to rub on the stenotic bone. This condition, according to Dr. Gropper, is causally related to the claimant's work accident on March 30, 1999. Dr. Gropper opined that, six months after his surgery, the claimant was capable of performing sedentary work. He stated that the claimant could work as a checker and, except for transporting injured workers, could perform the duties of a warehouse foreman. However, he also testified that the claimant could not do any climbing and should be restricted to administrative duties.

The claimant was examined by Dr. Scott A. Kale on April 16, 2002. Dr. Kale also reviewed the claimant's medical records. He testified

that the medial meniscus tear to the claimant's left knee was directly related to his fall on March 30, 1999, and determined that the claimant's present need to use a cane to walk was caused by that injury. He also found that the claimant's lumbar spine was abnormal and that his neck developed significant structural abnormalities, all as a result of his fall. Dr. Kale opined that the claimant's work accident was "a component cause" of the surgery preformed by Dr. Gropper. Dr. Kale testified that the claimant's current physical limitations are causally related to his injury on March 30, 1999, and that those limitations are permanent. Dr. Kale stated that the claimant is capable of performing sedentary work, but that he should not be allowed to climb ladders.

At the arbitration hearing, the claimant testified that his left knee is always sore, that he has "quite a bit" of pain in his neck and left shoulder, and that he experiences numbness and tingling in his left hand and forearm. He stated that he cannot bend his neck and that he has no balance, requiring the use of a cane to walk.

Edward Rascati, a vocational rehabilitation consultant engaged by Federal Marine, conducted an evaluation of the claimant. He testified that he reviewed the claimant's medical records, the medical restrictions issued by Drs. Gropper, Goldberg and Kale, and performed a job analysis and a labor market survey. Rascati stated that the claimant is not capable of performing the duties of a warehouse manager, yard foreman or checker. He was, however, of the opinion that the claimant could obtain employment within a reasonably stable labor market. Rascati testified that the claimant could perform sedentary work and that he possessed transferable skills which would be useful in several positions which his current physical limitations would allow him to perform. Rascati believed that the claimant's physical condition would allow him to perform the sedentary duties of a security guard, a dispatcher, or a field/clerical worker for a township assessor.

Susan Entenberg, a vocational rehabilitation specialist, testified on behalf of the claimant. She testified that she interviewed the claimant on January 24, 2002, and reviewed his medical records, Dr. Gropper's deposition, a functional capacity evaluation, a labor market survey, and a job analysis report. Entenberg was of the opinion that the claimant could not perform the duties of either a security guard or a dispatcher. According to her, the claimant has no transferable skills, has difficulty using either hand, has poor balance, and must avoid prolonged sitting or standing. Based upon the claimant's age, education, work experience, and physical limitations, Entenberg opined that he is not capable of gainful employment and is not a candidate for vocational rehabilitation.

Also testifying for the claimant at the arbitration hearing was Bror Johnson, the secretary-treasurer of the International Longshoreman's Association, Checkers Union, Local 1803. He testified to the duties of a longshoreman, a checker, and a yard foreman. He stated that he has known the claimant for 30 years and had worked with him at Federal Marine. According to Johnson, before the claimant's fall on March 30, 1999, he had never seen him use a cane. Johnson testified that, in his opinion, none of the terminal companies that his union deals with would presently employ the claimant in any capacity.

Following the arbitration hearing, the arbitrator issued a decision in which he found that the claimant sustained accidental injuries arising out of and in the course of his employment with Federal Marine on March 30, 1999. The arbitrator awarded the claimant 141 weeks of temporary total disability (TTD) benefits and ordered Federal Marine to pay the claimant $143,125.68 for medical expenses. In addition, the arbitrator found that the claimant was permanently and totally disabled and awarded him a $618.54 weekly benefit commencing on December 7, 2001, and continuing thereafter so long as his disability continues.

Federal Marine filed a petition for review of the arbitrator's decision before the Commission. The Commission, in addition to affirming and adopting the arbitrator's decision, ordered Federal Marine to hold the claimant harmless for any medical expenses that he incurred as a result of his injury and to reimburse the claimant's group insurance carrier for any sums paid on account of his injury.

Federal Marine sought a judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

First, Federal Marine argues that the instant claim is preempted by the federal Longshore and Harbor Workers' Compensation Act (LHWCA) (33 U.S.C. §901 *et seq.* (1994)), and as a consequence, the Commission erred in failing to dismiss the action on that basis. Federal Marine contends that, although the LHWCA does not preempt the field with respect to all state workers' compensation claims, conflicts existing between the LHWCA and the Act require a finding that the claim brought pursuant to the Act in this case is preempted. Federal Marine's argument in this regard is based upon the doctrine of "conflict preemption." The conflict which Federal Marine identifies as giving rise to an application of the doctrine is the greater liability which it faces under the Act than it would face under the LHWCA by reason of its inability to avail itself of the benefits of the federal Secondary Injury Fund (see 33 U.S.C. §908(f)(1) (1994)). According to Federal Marine, its liability for the claimant's permanent disability

award under the LHWCA would be limited to 104 weeks of compensation, with the Federal Second Injury Fund making all subsequent payments. See 33 U.S.C. §908(f)(1) (1994). Whereas, if the claimant is allowed to recover under the Act and the Illinois Second Injury Fund is not liable for the payment of any portion of his permanent disability benefits, Federal Marine is liable for the entire award.

In *McCoy v. Industrial Comm'n*, 335 Ill. App. 3d 723, 781 N.E.2d 365 (2002), this court undertook a detailed analysis of the LHWCA, and its history. We briefly restate those portions of that history necessary to our resolution of Federal Marine's preemption claim.

When originally enacted in 1927, the LHWCA provided coverage for "disability or death [which] results from an injury occurring upon the navigable waters of the United States (including any dry dock)" if coverage was not provided by state workers' compensation statutes. 33 U.S.C. §903(a) (1928); *McCoy*, 335 Ill. App. 3d at 726. Due to the uncertainty which existed as to the circumstances under which state law would apply to a land-based injury of a maritime employee, the Supreme Court created a "twilight zone" into which factually questionable cases would fall and over which both federal and state courts could exercise concurrent jurisdiction. See *Davis v. Department of Labor & Industries*, 317 U.S. 249, 255-58, 87 L. Ed. 246, 249-51, 63 S. Ct. 225, 228-30 (1942). In 1972, the LHWCA was amended to provide coverage for: "disability or death [which] results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. §903(a) (1994). Additionally, the definition of an employee was changed, requiring that an injured employee seeking coverage must have been engaged in maritime employment. 33 U.S.C. §902(3) (1994). The 1972 amendment also deleted from the statute the provision that benefits were only available if coverage was not provided by state workers' compensation statutes. In *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 719-20, 65 L. Ed. 2d 458, 462-63, 100 S. Ct. 2432, 2435-36 (1980), the Supreme Court held that, since Congress had not declared that federal jurisdiction over the expanded areas of coverage provided in the 1972 amendments to the LHWCA was exclusive, the amendments extending jurisdiction of the statute supplement state workers' compensation laws rather than supplant them. Consequently, in *McCoy*, this court held that, "following the 1972 amendments to the LHWCA, federal and state courts have concurrent jurisdiction over those land-based injuries falling within the coverage of the federal act." *McCoy*, 335 Ill. App. 3d at 729.

Nevertheless, Federal Marine, relying on the doctrine of conflict preemption, maintains that the claimant's right to recover benefits in this case rests exclusively in the federal courts under the LHWCA. Federal Marine asserts that conflict preemption may be applied in situations where state law acts as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting a federal statute. See *Southern Pacific Transportation Co. v. Public Utility Comm'n*, 9 F.3d 807, 810 (9th Cir. 1993). It argues that, if the claimant is allowed to recover under the Act in this case, its liability is increased due to an inability to avail itself of the benefits of the federal Second Injury Fund. According to Federal Marine, its ability to obtain relief under the Illinois Second Injury Fund created pursuant to section 7(f) of the Act (820 ILCS 305/7(f) (West 1994)) is far more difficult than its ability to obtain relief under the federal Second Injury Fund (33 U.S.C. §908(f) (1994)). We, however, reject the notion that permitting recovery under the Act for a land-based injury, even under circumstances where an employer is unable to avail itself of the LHWCA's more liberal Second Injury Fund benefits, would in any way act as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the 1972 amendments to the LHWCA.

"The legislative policy animating the LHWCA's landward shift was remedial; the amendments' framers acted out of solicitude for the workers." *Sun Ship*, 447 U.S. at 725-26, 65 L. Ed. 2d at 466, 100 S. Ct. at 2439. The legislative history of the 1972 amendments does not mention preemption of state remedies and does not suggest that Congress intended to exclude state workers' compensation statutes from applying to injuries sustained in the "terrain newly occupied by the post-1972" LHWCA. *Sun Ship*, 447 U.S. at 721, 65 L. Ed. 2d at 464, 100 S. Ct. at 2437. Concurrent jurisdiction over land-based injuries, such as the one at issue in this case, does not frustrate Congress's intent to aid injured maritime workers. See *Sun Ship*, 447 U.S. at 726, 65 L. Ed. 2d at 467, 100 S. Ct. at 2439. Rather, it furthers that intent by eliminating the jurisdictional vagaries which existed prior to the Supreme Court's decision in *Davis*. See *Sun Ship*, 447 U.S. at 725, 65 L. Ed. 2d at 466, 100 S. Ct. at 2439. The only identifiable benefit to employers intended by Congress in the enactment of the 1972 amendments to the LHWCA was the elimination of the longshoremen's strict liability remedy against shipowners for injuries resulting from a craft's unseaworthiness. See *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates*, 459 U.S. 297, 313, 74 L. Ed. 2d 465, 478, 103 S. Ct. 634, 645 (1983); *Sun Ship*, 447 U.S. at 724, 65 L. Ed. 2d at 466, 100 S. Ct. at 2439.

■ Finding nothing in the legislative history of the 1972 amendments to the LHWCA that would indicate that Congress was concerned with the disparity between an employer's ability to avail itself of second injury fund relief under the LHWCA and more restrictive or less favorable relief under state second injury funds, we reject Federal Marine's argument that the relief granted to the claimant under the Act in this case would in any way frustrate the purposes and objectives of Congress in enacting the 1972 amendments to the LHWCA. For these reasons, we conclude that the claimant's action is not preempted by the LHWCA, and Federal Marine's motion to dismiss was properly denied by the Commission.

■ Next, we address Federal Marine's argument that the Commission erred in failing to order a portion of the claimant's benefits paid by the Illinois Second Injury Fund pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 1998)). Federal Marine asserts that the injury sustained by the claimant as a result of his fall on March 30, 1999, coupled with the preexisting condition of his right hand, resulted in the ultimate finding that the claimant was totally and permanently disabled. According to Federal Marine, the March 30, 1999, accident "by itself should not have caused significant injury." It is only when the work-related injury combined with the preexisting paralysis of the claimant's right hand that he was rendered totally and permanently disabled. As a consequence, Federal Marine maintains that benefits should be paid to the claimant from the Illinois Second Injury Fund. Critical to its argument in this regard is Federal Marine's assertion that the claimant's paralysis resulted in a total loss of use of his right hand.

Section 8(f) of the Act provides, in relevant part, as follows:

"If an employee who had previously incurred loss or the permanent and complete loss of use of one member, through the loss or permanent and complete loss of the use of one hand ***, incurs permanent and complete disability through the loss or the permanent and complete loss of the use of another member, he shall receive, in addition to the compensation payable by the employer and after such payments have ceased, an amount from the Second Injury Fund provided for in paragraph (f) of Section 7, which, together with the compensation payable from the employer in whose employ he was when the last accidental injury was incurred, will equal the amount payable for permanent and complete disability as provided in this paragraph of this Section." 820 ILCS 305/8(f) (West 1998).

In the case of *State Treasurer of Illinois v. Industrial Comm'n*, 75 Ill. 2d 240, 244, 388 N.E.2d 419 (1979), our supreme court interpreted

this statute to mean that recovery under the Illinois Second Injury Fund requires that, prior to the most recent work-related injury, the claimant must have suffered the loss or permanent and complete loss of the use of one member. In this case, there was no such finding. Further, although the record reflects that the claimant's right hand was paralyzed as the result of a childhood injury, there is no evidence that the paralysis resulted in the complete loss of the use of the hand. The claimant testified that he could use his right hand to hold and lift objects. Dr. Kale, the only physician to address the extent of loss of use of the claimant's right hand, characterized the hand as functionally limited to a large extent. In the absence of evidence that the claimant had a preexisting complete loss of use of his right hand, there is no basis upon which the Commission could have ordered a portion of his benefits paid from the Illinois Second Injury Fund, and, as a consequence, we find no error in the Commission's failure to do so. Because of our finding in this regard, we need not address Federal Marine's equal protection argument.

■ Finally, we address Federal Marine's argument that the Commission erred in finding that the claimant is totally and permanently disabled. Its argument in this regard appears to be two-pronged. First, Federal Marine asserts that the Commission erred in concluding that the claimant is not capable of gainful employment. Second, it contends that, even if he is not capable of gainful employment, any incapacity which the claimant suffers is the result of physical impairments and conditions that are preexisting or unrelated to his work accident of March 30, 1999. In both instances, Federal Marine characterizes the Commission's determinations as erroneous as a matter of law.

Initially, we disagree that the issues presented by Federal Marine are questions of law. The question of whether a claimant is totally and permanently disabled is one of fact to be determined by the Commission (*Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 901, 810 N.E.2d 54 (2004)), as is the question of whether there is a causal relationship between a work accident and the claimant's current condition of ill-being (*Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954 (1984)). The Commission's resolution of a factual issue will not be set aside on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005 (1987). Even in cases where the facts are undisputed, we still apply a manifest-weight standard if more than one reasonable inference might be drawn from the facts. *Orsini*, 117 Ill. 2d at 44. It is only in those cases where the undisputed facts are susceptible to but a single inference that the inquiry becomes one of law and our review *de novo*. *Illinois Consolidated Telephone Co. v.*

*Industrial Comm'n*, 314 Ill. App. 3d 347, 349, 732 N.E.2d 49 (2000). In this case, the facts relevant to a determination of the nature and extent of the claimant's disability are clearly in dispute as are the facts surrounding the question of whether, or to what extent, that claimant is capable of gainful employment.

Johnson testified that, in his opinion, none of the terminal companies that his union deals with would employ the claimant in any capacity. Drs. Goldberg, Gropper, and Kale each opined that the claimant was capable of performing sedentary work. Dr. Bush Joseph, one of Federal Marine's examining physicians, opined that, as of September 14, 1999, the claimant could return to work as a warehouse supervisor with permanent restrictions against lifting with his left upper extremities, kneeling, squatting, or climbing. Dr. Goldberg, also one of Federal Marine's examining physicians, stated in his report that the claimant is not capable of returning to his former position as a warehouse manager. Dr. Gropper testified that the claimant could work as a checker and, except for transporting injured workers, could perform the duties of a warehouse foreman. However, he also stated that the claimant could not do any climbing and should be restricted to administrative duties. Dr. Kale testified that the claimant should not be allowed to climb ladders. He was also of the opinion that the restrictions placed upon the claimant by Dr. Gropper were light-work restrictions, not sedentary-work restrictions. Rascati, Federal Marine's vocational rehabilitation expert, testified that the position of warehouse manager, yard foreman, and checker are not sedentary work and that the claimant is not capable of performing the duties of any of those positions. He was of the opinion, however, that the claimant could obtain employment within a reasonably stable labor market. Rascati believed that the claimant's physical condition would allow him to perform the sedentary duties of a security guard, a dispatcher, or a field/clerical worker for a township assessor. Entenberg, the claimant's vocational rehabilitation expert, testified that he could not perform the duties of either a security guard or a dispatcher. According to her, the claimant has no transferable skills, has difficulty using either hand, has poor balance, and must avoid prolonged sitting or standing. Entenberg opined that, based upon the claimant's age, education, work experience, and physical limitations, he is not capable of gainful employment and is not a candidate for vocational rehabilitation.

In *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286-87, 447 N.E.2d 842 (1983), the supreme court held:

> "[A]n employee is totally and permanently disabled when he 'is unable to make some contribution to the work force sufficient to

justify the payment of wages.' [Citations.] The claimant need not, however, be reduced to total physical incapacity before a permanent total disability award may be granted. [Citations.] Rather, a person is totally disabled when he is incapable of performing services except those for which there is no reasonable stable market. [Citation.] Conversely, an employee is not entitled to total and permanent disability compensation if he is qualified for and capable of obtaining gainful employment without serious risk to his health or life. [Citation.] In determining a claimant's employment potential, his age, training, education, and experiences should be taken into account. *A.M.T.C. of Illinois, Inc. v. Industrial Com.*, (1979), 77 Ill. 2d 482, 489; *E.R. Moore Co. v. Industrial Com.*, (1978), 71 Ill. 2d 353, 362.

In considering the propriety of a permanent and total disability award, this court [has] recently stated:

'Under *A.M.T.C.*, if the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has initially established that he falls in what has been termed the "odd-lot" category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market [citation]), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant [citation].' *** [Citations.]" (Emphasis omitted.)

There are three ways that a claimant can establish permanent and total disability, namely: by a preponderance of medical evidence; by showing a diligent but unsuccessful job search; or by demonstrating that, because of his age, training, education, experience, and condition, there are no jobs available for a person in his circumstances. *ABB C-E Services v. Industrial Comm'n*, 316 Ill. App. 3d 745, 750, 737 N.E.2d 682 (2000).

In this case, the Commission, relying upon the opinions of Entenberg and rejecting the contrary opinion of Rascati, found that the claimant is permanently and totally disabled and that his disabilities prevent him from engaging in stable and continuous employment. It was the Commission's function to judge the credibility of the witnesses and resolve any conflicts in their testimony. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). The Commission's finding that the claimant is permanently and totally disabled is supported by competent evidence, and an opposite conclu-

sion is not clearly apparent. We, therefore, reject Federal Marine's argument that the Commission's determination in this regard is against the manifest weight of the evidence. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992).

On the issue of causation, Federal Marine concedes that, as a result of his work-related injury on March 30, 1999, "the claimant sustained an aggravation injury to his cervical spine and sustained an injury to his left leg." It maintains, however, that "the vast majority of claimant's impairment stems from the Claimant's unrelated lumbar spine condition." Federal Marine argues that the Commission erred in finding that the claimant is entitled to permanent total disability benefits because it failed to differentiate between those conditions which were causally related to the claimant's work accident and his preexisting and unrelated conditions. We disagree.

"[A] preexisting condition does not prevent recovery under the Act if that condition was aggravated or accelerated by the claimant's employment." *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 36, 440 N.E.2d 861 (1982). In order to entitle a claimant to benefits under the Act, his work-related injury need not be the sole factor that aggravates his preexisting condition, "so long as it is a factor that contributes to the disability." *Caterpillar Tractor Co.*, 92 Ill. 2d at 36. Whether a claimant's disability is attributable to an aggravation or acceleration of a preexisting condition is a question of fact for the Commission to resolve. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205, 797 N.E.2d 665 (2003).

The claimant testified that, as a result of his accident on March 30, 1999, he injured his left knee, left shoulder and neck. He stated that, as of the date of the arbitration hearing, his left knee is always sore, he has "quite a bit" of pain in his neck and left shoulder, he experiences numbness and tingling in his left hand and forearm, he cannot bend his neck, and he has no balance, requiring the use of a cane. Dr. Gropper diagnosed the claimant as suffering from cervical radiculopathy and myelopathy which resulted from his having rotated his spinal cord, causing his nerves to rub on the stenotic bone. This condition, according to Dr. Gropper, is causally related to the claimant's work accident on March 30, 1999. Dr. Kale opined that the claimant's left knee injury is causally related to his fall on March 30, 1999. He testified that the claimant's left knee injury resulted in the claimant's need to use a cane to walk. According to Dr. Kale, the claimant developed "significant structural abnormalities" in his neck as a result of his work accident. Dr. Kale also testified that the claimant's current physical limitations are causally related to his injury on March 30, 1999, and that those limitations are permanent.

It was the function of the Commission to decide questions of credibility and to resolve conflicting medical evidence. *O'Dette*, 79 Ill. 2d at 253. Based upon the record before us, we are unable to find that the Commission's determination that a causal relationship exists between the claimant's work accident and both his current physical condition and his permanent disability is against the manifest weight of the evidence.

Based upon the foregoing analysis, we affirm the judgment of the circuit court which confirmed the Commission's decision awarding the claimant benefits under the Act.

Affirmed.

McCULLOUGH, P.J., and GROMETER, HOLDRIDGE, and DONOVAN, JJ., concur.