966 N.E.2d 40 (2012)
358 Ill. Dec. 855
PROFESSIONAL TRANSPORTATION, INC., Appellant,
v.
ILLINOIS WORKERS' COMPENSATION COMMISSION et al. (Barry A. Clarke, Appellee).
No. 3-10-0783 WC.
Appellate Court of Illinois, Third District, Workers' Compensation Commission Division.
January 19, 2012.
*42 Valerie J. Peiler, Mark F. Vizza, Brady, Connolly & Masuda, P.C., Chicago, for Professional Transportation, Inc.
Patrick J. Hanlon, Frederick & Hagle, Urbana, for Barry A. Clarke.

OPINION
Justice HOFFMAN delivered the judgment of the court, with opinion.
¶ 1 Professional Transportation, Inc. (Professional), appeals from an order of the circuit court of Kankakee County, confirming a decision of the Illinois Workers' Commission (Commission) which awarded the claimant, Barry A. Clarke, benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 et seq. (West 2002)) which included permanent total disability (PTD) benefits under section 8(f) of the Act (820 ILCS 305/8(f) (West 2002)) and a recovery for medical expenses in the sum of $131,626.31. Professional argues that the Commission's award of PTD benefits is against the manifest weight of the evidence and that its award of medical expenses both violates the law-of-the-case doctrine and is against the manifest weight of the evidence. For the reasons which follow, we affirm in part and reverse in part the circuit court's judgment, set aside in part and modify in part the Commission's decision, and remand this matter to the Commission for further proceedings.
¶ 2 The following factual recitation is taken from the record and the evidence presented at the arbitration hearings.
¶ 3 The claimant was employed by Professional as the driver of a multi-passenger van, transporting railroad workers to and from the Kankakee railroad yards. He drove the vehicle over 200 miles per day, covering various routes. In addition to driving the vehicle, the claimant's duties included loading and unloading the passengers' packs weighing 60 to 70 pounds and cleaning out the van. Prior to working for Professional, the claimant had been employed as an air traffic controller for 27 years.
¶ 4 As the claimant was cleaning out the van on March 26, 2003, he stepped down from the vehicle onto a frozen clump of ice and rock, twisting his right knee. According to the claimant, he felt a tear within his right knee. On that same day, the claimant sought treatment from his primary care physician, Dr. Rahul Deepankar, who referred him to Dr. Alexander Michalow, an orthopedic surgeon at Orthopedic Associates of Kankakee.
*43 ¶ 5 Dr. Michalow ordered a MRI of the claimant's right knee which was performed on March 27, 2003. The scan revealed a large tear of the medial meniscus. As a consequence, Dr. Michalow recommended that the claimant undergo arthroscopic surgery.
¶ 6 Dr. Michalow performed arthroscopic surgery upon the claimant's right knee on April 8, 2003. Dr. Michalow's postoperative diagnosis was a medial meniscus tear, multiple loose bodies, chondromalacia of the femoral trochlea, and mild diffuse synovitis.
¶ 7 The claimant remained off of work from the date of the accident until July 2003, when he attempted to return to work. However, his attempted return to work as a driver lasted only four hours when his right knee began to swell. The claimant returned to see Dr. Deepankar on July 31, 2003. Dr. Deepankar authorized the claimant to remain off of work until further notice and referred him back to Dr. Michalow.
¶ 8 The claimant continued under the care of Dr. Michalow. On March 3, 2004, Dr. Michalow diagnosed the claimant as suffering from arthritis in the patellofemoral compartment of the right knee. Dr. Michalow authorized the claimant to return to a sitting job that required only minimal walking. On March 31, 2004, Dr. Michalow referred the claimant to Dr. Milton Smit, also an orthopedic surgeon at Orthopedic Associates of Kankakee, for a second opinion.
¶ 9 Dr. Smit examined the claimant in April 2004 and recommended a total right knee replacement. Dr. Smit was of a belief that the claimant could return to work if a sitting job with minimal walking was available.
¶ 10 The claimant was referred to Dr. Brian Cole, an orthopedic surgeon at Rush-Presbyterian Medical Center, for another opinion. Dr. Cole examined the claimant on June 7, 2004, and diagnosed bi- to tricompartmental osteoarthritis. Dr. Cole concluded that the claimant was probably a candidate for a total right knee replacement and referred him to his associate, Dr. Mitchell Sheinkop, for further treatment.
¶ 11 According to the claimant, it was in June 2004 that he started to notice swelling and pain in his left knee. He stated that he had been favoring his left knee while walking.
¶ 12 On August 20, 2004, the claimant was examined by Dr. Sheinkop. He diagnosed the claimant as suffering from post-traumatic arthritis of the right knee which was the result of the claimant's work accident in March 2003. Dr. Sheinkop determined that the claimant was a candidate for replacement surgery on both his right and left knees.
¶ 13 The claimant underwent bilateral knee replacement surgery which was performed by Dr. Sheinkop on October 26, 2004. The claimant's recovery from that surgery was complicated by his having developed a pulmonary embolism in his left lung while hospitalized. The claimant was not released from the hospital until November 6, 2004. According to Dr. Sheinkop's testimony, a thrombophlebitis resulting in a pulmonary embolism is a known complication of knee replacement surgery, necessitating prolonged hospitalization and anticoagulant treatment.
¶ 14 The claimant continued under the care of Dr. Sheinkop following his release from the hospital. On March 7, 2005, Dr. Sheinkop noted that the claimant still complained of pain in both knees. On June 17, 2005, Dr. Sheinkop noted that the claimant had excellent functional capacity, yet complained of pain that was out of proportion to the level to be expected based upon his *44 examination and X-ray analysis. Suspecting that the claimant might be suffering from a metal allergy, Dr. Sheinkop ordered metal sensitivity tests, which revealed that the claimant had a mild degree of reactivity to nickel.
¶ 15 When deposed, Dr. Sheinkop testified that he restricted the claimant from squatting, kneeling, frequent use of stairs, climbing, and lifting or carrying in excess of 40 pounds. However he did not place any restrictions on his driving other than requiring his use of a vehicle with an automatic transmission. He stated that the claimant could stand up to two hours per day and could sit from six to eight hours. According to Dr. Sheinkop, a job requiring the claimant to drive for long periods of time would put him at risk of suffering another pulmonary embolism. The claimant would require periodic breaks from driving to allow him to walk around.
¶ 16 Approximately six months after the claimant's surgery, a supervisor from Professional contacted him and inquired about his returning to work. The claimant related his symptoms and the medication that he was taking. According to the claimant, Professional never again called him and thereafter terminated his employment. Lowell Woods, Professional's risk manager, testified that the company could have accommodated the restriction placed upon the claimant by Dr. Sheinkop, but that, to his knowledge, the claimant never called back. Woods stated that Professional's policies permit a driver to pull over and take a break if the driver is feeling fatigued of feels that a break is necessary. However, the claimant denied ever being told that he could pull over and take a break and observed that the railroad crews which he transported were on time schedules.
¶ 17 On July 26, 2005, the claimant was examined by Dr. James Cohen at the request of Professional. Dr. Cohen testified that the claimant had bilateral knee arthritis which would have ultimately required bilateral knee replacements even in the absence of his work-related accident. With the exception of requiring periodic breaks, Dr. Cohen found that Dr. Sheinkop's restrictions were reasonable. According to Dr. Cohen, he saw no reason why the claimant could not return to working as a van driver due to his total knee replacements or based upon his risk of developing pulmonary emboli.
¶ 18 Dr. Sheinkop testified that the claimant's right knee condition is the result of his work-related accident. As to the claimant's left knee condition, Dr. Sheinkop opined that it is not the result of the claimant's work-related accident; rather, it is the result of arthritic disease.
¶ 19 On September 27, 2005, the claimant underwent a functional capacity evaluation (FCE). The report of that test reflects that the claimant provided maximum effort and demonstrated the physical capability and tolerance for work in the light and medium-light categories. The evaluator noted that the claimant would benefit from physical therapy followed by a work hardening program.
¶ 20 At the request of his attorney, the claimant was examined by Dr. David Fletcher on September 29, 2005. Dr. Fletcher found that the claimant had poor lower extremity strength and balance. He believed that the claimant's condition was due to degenerative osteoarthritis that was permanently aggravated by the claimant's work-related accident. Dr. Fletcher was of the opinion that the claimant may be in need of further treatment. According to Dr. Fletcher, the claimant is not capable of returning to work as an air traffic controller which requires getting up and down on a regular basis and is not capable of driving a commercial vehicle as he is unable to *45 climb in and out of a truck. He recommended that the claimant be permanently restricted to sit-down, sedentary work.
¶ 21 On January 17, 2006, the claimant again saw Dr. Smit at Orthopedic Associates of Kankakee. Dr. Smit noted that the claimant complained of bilateral knee pain since his surgery. However, he found that the claimant's range of motion was good and that the claimant's x-rays revealed that his knee replacements "looked satisfactory."
¶ 22 A labor market study was performed by David Wolf, a vocational rehabilitation counselor employed by Professional. Wolf's report dated August 21, 2006, summarized the claimant's physical restrictions as set forth in his FCE, his age, his education, and the claimant's work experience. Wolf found that, based upon his restrictions, the claimant could not return to his employment as a van driver for Professional. He concluded that the claimant has no "clear" transferable skills. Wolf believed that the claimant could perform as an entry level cashier for an employer that would accommodate the claimant's restrictions as to standing, walking, climbing, stooping, reaching, and lifting, and he identified nine automobile dealerships as potential employers that could accommodate the claimant's restrictions. Wolf concluded his report by stating that, based upon the information provided by the claimant, "it appears as if * * * [the claimant] is capable of returning to work in a cashier position at an auto dealership." The report also states that, "[b]ased on the National Labor Force Statistics for 2002-2012 * * *, the occupation of Cashier is projected to increase by 9.0% in the State of Illinois and 6.2% in the Kankakee area."
¶ 23 Between October 25 and October 26, 2006, the claimant applied for employment at the nine dealerships identified by Wolf. Only one of the dealerships called him back and none offered him a position. The claimant testified that, for the 1 ½ year period preceding the arbitration hearing, he continuously looked in the Sunday newspaper for a job, but to no avail.
¶ 24 The claimant testified that his right knee has not improved since his release from the hospital following knee replacement surgery. He stated that he takes daily medications for pain, inflammation, circulatory problems, and sleeplessness which make him groggy, dizzy, and cause concentration problems. The claimant testified that he suffers from soreness under his kneecaps and that his knees frequently lock up. According to the claimant, he can only stand for short periods, 10 to 20 minutes at a time; and, on good days, he can walk 100 yards, but on bad days, he cannot walk at all.
¶ 25 At the time of the arbitration hearing, the claimant was 64 years old which prevents him from returning to work as an air traffic controller.
¶ 26 On May 18, 2007, following the initial arbitration hearing, the arbitrator issued a decision in which he found that the claimant sustained injuries on March 26, 2003, which arose out of and in the course of his employment with Professional. He found that the claimant's condition of ill-being as it relates to his right knee and the pulmonary embolism that developed following his knee replacement surgery are causally related to the claimant's work accident of March 26, 2003, but that no causal relationship exists as to the claimant's left knee condition of ill-being. The arbitrator awarded the claimant temporary total disability (TTD) benefits for an intermittent period consisting of 115 5/7 weeks and 130 weeks of permanent partial disability (PPD) benefits under the Act for a 65% loss of use of his right leg. The arbitrator found that the claimant failed to prove his entitlement to PTD disability *46 benefits either on the basis of medical evidence or on an "odd-lot" theory. He noted that the claimant failed to demonstrate a diligent but unsuccessful job search or that he is unfit to perform any but the most menial tasks for which no stable job market exists. In addition, the arbitrator found Professional liable for the payment of $88,637.65 in medical expenses incurred by the claimant.
¶ 27 The claimant sought a review of the arbitrator's May 18, 2007, decision. On August 5, 2008, the Commission issued a decision awarding the claimant 115 5/7 weeks of TTD benefits and PTD benefits in the sum of $222.09 per week for life beginning February 16, 2006. The Commission found that the claimant is entitled to PTD benefits on an "odd-lot" theory. Specifically, the Commission found that:
"the * * * [claimant] presented evidence that both supports and negates a finding of an `odd-lot' permanent total under Section 8(f) of the Act. It is likely that the * * * [claimant] could find some sit down/sedentary job and/or light-medium job given his transferable skills, education, and experience. However, it appears that * * * [claimant's] age, Mr. Wolf's opinion that * * * [claimant] has nontransferable skills and * * * [claimant's] current physical restrictions and condition weigh heavier against finding that * * * [claimant] is employable in a regularly well-known branch of the labor market than does the possible [sic] that he has potential transferable skills, education and experience that would weigh in favor of such employment."
As for the medical expenses awarded by the arbitrator, the Commission found that "the current record is devoid of sufficient evidence" to make a determination as to which of the medical bills submitted by the claimant pertained to his right knee as opposed to his left knee. As a consequence, the Commission remanded the case back to the arbitrator with "specific instructions to take additional evidence as to the causal relationship and reasonableness and necessity of the medical expenses as they relate to the right knee injury only."
¶ 28 On September 3, 2008, the Commission issued a corrected decision containing all of the findings and holdings of its August 5, 2005, decision save for the weekly PTD benefit to which the claimant is entitled. The Commission corrected the amount to $376.66 per week.
¶ 29 On remand, without the taking of any additional evidence as instructed by the Commission, an arbitrator filed a decision on April 13, 2009, finding Professional responsible for the payment of $131,626.31 in medical expenses incurred by the claimant.
¶ 30 Professional sought a review before the Commission of the arbitrator's decision on remand. In a decision dated February 26, 2010, the Commission affirmed and adopted the arbitrator's decision of April 13, 2009.
¶ 31 Thereafter, Professional sought judicial review of the Commission's decisions of September 3, 2008, and February 26, 2010, in the circuit court of Kankakee County. The circuit court confirmed the Commission's decisions, and this appeal followed.
¶ 32 On appeal, Professional argues that the Commission's award of PTD benefits to the claimant on an "odd-lot" basis is against the manifest weight of the evidence and that its award of medical expenses in the sum of $131,626.31 both violates the law-of-the-case doctrine and is against the manifest weight of the evidence.
*47 ¶ 33 We address first the award of PTD benefits. In a workers' compensation case, the claimant has the burden of establishing, by a preponderance of the evidence, the extent and permanency of his injury. Chicago Park District v. Industrial Comm'n, 263 Ill.App.3d 835, 843, 200 Ill.Dec. 431, 635 N.E.2d 770 (1994). The extent of a claimant's disability is a question of fact to be determined by the Commission. Oscar Mayer & Co. v. Industrial Comm'n, 79 Ill.2d 254, 256, 37 Ill.Dec. 605, 402 N.E.2d 607 (1980). The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. Orsini v. Industrial Comm'n, 117 Ill.2d 38, 44, 109 Ill.Dec. 166, 509 N.E.2d 1005 (1987). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. Caterpillar, Inc. v. Industrial Comm'n, 228 Ill.App.3d 288, 291, 169 Ill.Dec. 390, 591 N.E.2d 894 (1992).
¶ 34 An injured employee can establish his entitlement to PTD benefits under the Act in one of three ways, namely: by a preponderance of medical evidence; by showing a diligent but unsuccessful job search; or by demonstrating that, because of age, training, education, experience, and condition, there are no available jobs for a person in his circumstance. Federal Marine Terminals, Inc. v. Illinois Workers' Compensation Comm'n, 371 Ill.App.3d 1117, 1129, 309 Ill.Dec. 597, 864 N.E.2d 838 (2007). In Ceco Corp. v. Industrial Comm'n, 95 Ill.2d 278, 286-87, 69 Ill.Dec. 407, 447 N.E.2d 842 (1983), the supreme court held that:
"an employee is totally and permanently disabled when he `is unable to make some contribution to the work force sufficient to justify the payment of wages.' [Citations]. The claimant need not, however, be reduced to total physical incapacity before a permanent total disability award may be granted. [Citations.] Rather, a person is totally disabled when he is incapable of performing services except those for which there is no reasonable stable market. [Citation.] Conversely, an employee is not entitled to total and permanent disability compensation if he is qualified for and capable of obtaining gainful employment without serious risk to his health or life. [Citation.] In determining a claimant's employment potential, his age, training, education, and experience should be taken into account. A.M.T.C. of Illinois, Inc. v. Industrial Com. (1979), 77 Ill.2d 482, 489 [34 Ill. Dec. 132, 397 N.E.2d 804]; E.R. Moore Co. v. Industrial Com. (1978), 71 Ill.2d 353, 362 [17 Ill.Dec. 207, 376 N.E.2d 206].
In considering the propriety of a permanent and total disability award, this court has recently stated:
`Under A.M.T.C., if the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has initially established that he falls in what has been termed the "odd-lot" category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market [citation]), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant [citation].' [Citations.]" (Emphasis omitted.)
*48 ¶ 35 In this case, there is no medical evidence which could support a claim of total disability. To the contrary, Drs. Smit, Michalow, Sheinkop, Cohen, and Fletcher each voiced opinions that the claimant could work, albeit with varying restrictions. As for evidence that the claimant engaged in a diligent but unsuccessful job search, we note that the arbitrator concluded that the claimant failed to demonstrate that he made diligent but unsuccessful attempts to find work, and the Commission on review failed to take issue with the finding. Further, in his brief before this court, the claimant makes no argument that applying for cashier positions at nine auto dealerships and looking in the Sunday newspaper constituted a diligent job search. We agree with the arbitrator that the evidence fails to support a finding that the claimant's meager efforts to find work constituted a diligent but unsuccessful job search. We are left then with the question of whether the evidence of record can support the Commission's conclusion that, because of his age, training, education, experience, and physical condition, the claimant is not regularly employable in a well-known branch of the labor market.
¶ 36 In the absence of medical evidence to support a claim of total disability or his having conducted a diligent but unsuccessful job search, the claimant, who is not obviously unemployable, had the burden of proving by as preponderance of the evidence that he is so handicapped that he will not be employed regularly in any well-known branch of the labor market. Valley Mould & Iron Co. v. Industrial Comm'n, 84 Ill.2d 538, 546-47, 50 Ill.Dec. 710, 419 N.E.2d 1159 (1981); Westin Hotel v. Industrial Comm'n, 372 Ill.App.3d 527, 544, 310 Ill.Dec. 18, 865 N.E.2d 342 (2007). We conclude that the claimant failed to carry his burden in that regard.
¶ 37 Wolf, Professional's vocational rehabilitation expert, concluded that the claimant was capable of performing the duties of an entry level cashier for an employer willing to accommodate the claimant's restrictions. In addition, Wolf's report states that the occupation of cashier is projected to increase by 6.2% in the Kankakee area based upon the National Labor Force Statistics. In contrast, the claimant failed to introduce any evidence that there is no stable job market for a person of his age, skills, training, work history, and physical condition. In the absence of any such evidence, we hold that the Commission's finding that the claimant is entitled to PTD benefits as an "odd-lot" permanent total under section 8(f) of the Act (820 ILCS 305/8(f) (West 2002)) is against the manifest weight of he evidence. See Westin Hotel, 372 Ill.App.3d at 545, 310 Ill. Dec. 18, 865 N.E.2d 342. Although we are reluctant to set aside the Commission's decision on a factual question, we will not hesitate to do so when the clearly evident, plain, and indisputable weight of the evidence compels an opposite conclusion. Montgomery Elevator Co. v. Industrial Comm'n, 244 Ill.App.3d 563, 567, 184 Ill. Dec. 505, 613 N.E.2d 822 (1993).
¶ 38 Although we have concluded that the Commission's finding that the claimant is entitled to PTD benefits under an "odd-lot" theory is against the manifest weight of the evidence, it is clear that the claimant sustained some level of PPD. As a consequence the cause must be remanded to the Commission for a determination on this issue.
¶ 39 Next, Professional challenges the Commission's award of medical bills. First, it claims that the award violates the law-of-the-case doctrine. We disagree.
¶ 40 As earlier noted, in his May 18, 2007, decision, the arbitrator found Professional liable for $88,637.65 in medical expenses *49 incurred by the claimant. However on review, the Commission found that "the current record is devoid of sufficient evidence" to make a determination as to which of the medical bills submitted by the claimant pertained to his right knee as opposed to his left knee and, as a consequence, remanded the case back to the arbitrator with "specific instructions to take additional evidence as to the causal relationship and reasonableness and necessity of the medical expenses as they relate to the right knee injury only." On remand, however, the arbitrator did not consider additional evidence. Instead, by agreement of the parties, the arbitrator made additional findings with respect to the medical expenses based on the transcript of the previous arbitration hearing and issued a decision requiring Professional to pay $131,626.31 for medical expenses incurred by the claimant. On review of the arbitrator's decision on remand, the Commission affirmed and adopted the decision.
¶ 41 Professional now argues that, when the arbitrator failed to take additional evidence on remand as specifically directed, the Commission was bound under the law-of-the-case doctrine by its own earlier determination that the record was devoid of sufficient evidence to permit an allocation of medical expenses. The flaw in its argument in this regard is Professional's failure to recognize that the Commission's decision on review of the arbitrator's original decision which remanded the matter was interlocutory in nature. The law-of-the-case doctrine only binds a court when its prior order was final. Commonwealth Edison Co. v. Illinois Commerce Comm'n, 368 Ill.App.3d 734, 742, 306 Ill. Dec. 620, 858 N.E.2d 65 (2006). When, as in this case, the prior order did not dispose of the controversy between the parties, it is interlocutory in nature and may be modified or revised at any time prior to final judgment. Commonwealth Edison Co., 368 Ill.App.3d at 742, 306 Ill.Dec. 620, 858 N.E.2d 65. As a consequence, the law-of-the-case doctrine posed no impediment to the Commission awarding medical expenses based on the transcript of the original arbitration hearing.
¶ 42 Finally, Professional argues that the Commission's award of $131,626.31 for medical expenses is against the manifest weight of the evidence. Initially, we note that the claimant concedes that the Commission's award of $793.00 for the examination and removal of a mass from his shoulder by Orthopedic Associates of Kankakee and its award of $44.00 for an x-ray of his left knee by Kankakee Radiology Associates was error as these expenses do not relate in any way to his right knee injury. As for the remainder of the medical expenses, the claimant maintains that the Commission's award is not against the manifest weight of the evidence. We agree.
¶ 43 Questions as to the reasonableness, necessity and causal relationship of medical charges are factual in nature to be resolved by the Commission, and its resolution of such matters will not be disturbed on review unless against the manifest weight of the evidence. Westin Hotel, 372 Ill.App.3d at 546, 310 Ill.Dec. 18, 865 N.E.2d 342. The Commission awarded the claimant one-half of the total bill from Midwest Orthopedics at Rush-Presbyterian-St. Luke's Medical Center (Rush) for treatment from June 7, 2004, through May 9, 2005, and one-half of the bill from Rush for treatments from October 26, 2004, the date of the knee replacement surgeries, through October 28, 2004, the date upon which the claimant was admitted to intensive care. The Commission's apportionment of one-half to each of the claimant's knees benefitted Professional, as a portion *50 of the bills apportioned to the claimant's left knee such as medication, anesthesia and operating room charges would have been incurred in full if only the right knee were replaced. Although the claimant was treated for bilateral knee problems, the record does not suggest that the one-half of the expenses apportioned to the right knee for which Professional is responsible would have been less if the claimant had only suffered from problems with his right knee.
¶ 44 In addition, the Commission held Professional liable for the full amount of the medical expenses incurred at Rush after the claimant was admitted into intensive care until his discharge from the hospital on November 6, 2004. The evidence clearly supports its apportionment in this regard as the claimant's admission into intensive case and his extended stay in the hospital were related to a pulmonary embolism which was causally related to his right knee surgery.
¶ 45 The record contains all of the claimant's medical records, his itemized medical bills, and the deposition testimony of several of his treating physicians. The Commission found that "the medical bills are supported by the medical records" and that "many of the bills are itemized and note procedure and charges." It also determined that the arbitrator had compared the dates of service on the bills to the date of service in the medical records. Finally, Professional never introduced evidence at either arbitration hearing suggesting that the services rendered to the claimant, other than the $837 conceded by the claimant, were neither reasonable nor necessary. For these reasons, we believe that the method employed by the Commission for the apportionment of medical expenses is supported by the record and is not against the manifest weight of the evidence.
¶ 46 In summary, that portion of the circuit court's order confirming the Commission's award of PTD benefits on an "odd-lot" basis and its award of $837 for medical expenses incurred by the claimant for the examination and removal of a mass from his shoulder by Orthopedic Associates of Kankakee and for an X-ray of his left knee by Kankakee Radiology Associates is reversed; the circuit court's judgment is affirmed in all other respects; that portion of the Commission's decision awarding the claimant PTD benefits is set aside; the Commission's award of medical expenses is modified to provide that Professional is liable for the payment of $130,789.31 in medical expenses incurred by the claimant; and the cause is remanded to the Commission for consideration of an appropriate PPD award.
¶ 47 Circuit Court judgment affirmed in part and reversed in part; Commission decision set aside in part and modified in part; and cause remanded to the Commission for further proceedings.
Presiding Justice McCULLOUGH and Justices HUDSON and HOLDRIDGE concurred in the judgment and opinion.
Justice STEWART concurred in part and dissented in part, with opinion.
¶ 48 Justice STEWART, concurring in part and dissenting in part.
¶ 49 I respectfully dissent from the majority's determination that the Commission's finding that the claimant was permanently and totally disabled under the "odd-lot" category is against the manifest weight of the evidence, but otherwise concur in the majority's decision.
¶ 50 "The question of whether a claimant is permanently and totally disabled is one of fact to be resolved by the Commission, and its resolution of the issue will not be disturbed on appeal unless it is against the *51 manifest weight of the evidence." Ameritech Services, Inc. v. Illinois Workers' Compensation Comm'n, 389 Ill.App.3d 191, 203, 328 Ill.Dec. 612, 904 N.E.2d 1122, 1133 (2009). A finding of fact is contrary to the manifest weight of the evidence only when an opposite conclusion is clearly apparent. Id. The test for whether the Commission's determination of a question of fact is supported by the manifest weight of the evidence is not whether the reviewing court might reach the same conclusion, but whether there is sufficient evidence in the record to support the Commission's decision. Id.
¶ 51 The rules governing entitlement to odd-lot PTD benefits are well-established. "`[A] person is totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists.'" Valley Mould & Iron Co. v. Industrial Comm'n, 84 Ill.2d 538, 546, 50 Ill.Dec. 710, 419 N.E.2d 1159, 1163 (1981) (quoting E.R. Moore Co. v. Industrial Comm'n, 71 Ill.2d 353, 361-62, 17 Ill.Dec. 207, 376 N.E.2d 206, 210 (1978)). The claimant has the burden to prove all the essential elements of his claim, including the burden to initially establish that he falls into the odd-lot category, by a preponderance of the evidence. Courier v. Industrial Comm'n, 282 Ill.App.3d 1, 5-6, 217 Ill.Dec. 843, 668 N.E.2d 28, 30-31 (1996). The claimant need not be reduced to total physical incapacity but "must show that he is unable to perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them." Westin Hotel v. Industrial Comm'n, 372 Ill. App.3d 527, 544, 310 Ill.Dec. 18, 865 N.E.2d 342, 357 (2007). "The claimant ordinarily satisfies his burden of proving that he falls into the odd-lot category in one of two ways: (1) by showing diligent but unsuccessful attempts to find work, or (2) by showing that because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market." Westin Hotel, 372 Ill.App.3d at 544, 310 Ill.Dec. 18, 865 N.E.2d at 357. If the claimant establishes that he fits into the odd-lot category, the burden shifts to the employer to prove that the claimant is employable in a stable labor market and that such a market exists. Id.
¶ 52 In the present case, the Commission awarded the claimant PTD benefits based on a finding that he was unable to engage in stable and continuous employment because of his age, training, education, experience, and condition. In my view, the Commission's decision is not against the manifest weight of the evidence.
¶ 53 The claimant underwent an FCE in September 2005. The evaluator noted that the claimant gave maximum effort and that he demonstrated physical capabilities and tolerances between the light and light-medium categories. Dr. Fletcher believed that the claimant's permanent job restrictions should include sit-down and sedentary work. The claimant takes pain medications that cause him to be groggy, suffer from dizziness, and have problems with concentration. He testified that he suffers from soreness under his knee caps and that his knees frequently lock up. He can only stand for short periods with a maximum time of 15 to 20 minutes. On good days, he can walk 100 yards, but on bad days, he cannot walk at all. The claimant testified that he cannot kneel or squat and that his balance is questionable.
¶ 54 The record includes a labor market survey performed by a vocational rehabilitation counselor, David Wolf, who was hired by the employer. Wolf stated in his report that based on the claimant's "work history and restrictions there are no clear *52 transferable skills" and that the claimant's restrictions "prevent him from doing any driver work similar to his last job." Wolf chose "entry-level cashier" as the job goal for his labor market survey. His report included a list of car dealerships that had indicated to him that the claimant's restrictions would not prevent him from handling a cashier position. The claimant testified that he contacted all of the dealerships, but only one dealership responded to his application, and none of them offered him a job.
¶ 55 With respect to the claimant's ability to return to work as a driver, Dr. Sheinkop and Woods opined that certain exceptions could be made that would allow the claimant to return as a driver. Dr. Fletcher and the FCE evaluator did not believe that the claimant could return to work as a driver. The Commission found that the facts weighed in favor of finding that the claimant's age, training, education, experience, and condition prevented him from engaging in stable and continuous employment.
¶ 56 The Commission concluded that there was evidence that both supported and negated a finding of an "odd-lot" permanent total disability. It stated that it was likely that the claimant could find some sitdown/sedentary job and/or light to light-medium job given his potential transferable skills, education, and experience. However, it also noted that Wolf believed that the claimant had no transferable skills. The Commission weighed this conflicting evidence and ultimately concluded that the claimant's physical restrictions and conditions weighed against a finding that he is employable in a regularly well-known branch of the labor market. The resolution of the conflicting evidence was a question of fact for the Commission, and I cannot conclude that the Commission's findings were against the manifest weight of the evidence. There is sufficient evidence to support the decision of the Commission. An opposite conclusion is not clearly apparent from the record. Accordingly, I would affirm the Commission's award of PTD benefits.